Robert C. KARLSENG, Karlseng Law Firm, P.C., Ashley Brigham Patten, Patten & Karlseng, P.C., Jacques Yves LeBlanc, and LeBlanc, Patten and Karlseng Law Firm, P.C., Appellants,

v.

H. Jonathan COOKE, Appellee.

No. 05–09–01002–CV.

Court of Appeals of Texas, Dallas.

June 28, 2011.

Rehearing Overruled Sept. 9, 2011.

Susan Lea Hays, Godwin Ronquillo, P.C., Blake L. Beckham, Beckham & Thomas, L.L.P., James A. McCorquodale, Kleiman Lawrence Baskind Fitzgerald, L.L.P., Dallas, for Appellants.

Geoffrey Scott Harper, M. Brett Johnson, Elizabeth M. Bedell, Thomas M. Melsheimer, Fish & Richardson, P.C., Dallas, for Appellee.

Before Justices FITZGERALD, LANG–MIERS, and FILLMORE.

## OPINION

Opinion By Justice FITZGERALD.

This is an appeal from an order confirming an arbitrator's award of approximately $22 million in favor of appellee. Appellants raise four issues on appeal. In their first issue, they contend that their rights were prejudiced by the evident partiality of the arbitrator because the arbitrator failed to disclose his close personal and professional relationship with appellee's counsel.[1] We conclude the first issue is dispositive of this appeal. For the reasons discussed below we reverse the trial court's confirmation order and final judgment, vacate the arbitration award, and remand the case for further proceedings.

### PROCEDURAL BACKGROUND

This is a partnership dispute.[2] The parties agreed to arbitrate their dispute under the rules of JAMS, a provider of alternative dispute resolution services. They selected Robert Faulkner, a former federal magistrate judge, as their single arbitrator. Appellee was represented in the arbitration by the firm of Fish & Richardson, P.C. and, specifically, by attorneys Elizabeth Bedell and Geoffrey Harper. Faulkner made certain disclosures using the JAMS form. Faulkner disclosed that he

1. Appellants also contend that the trial court erroneously limited questioning of the arbitrator concerning that relationship; the trial court erroneously denied appellants' request for a jury trial; and the award is not appropriate on substantive grounds.

2. The facts underlying the parties' substantive dispute are set forth in detail in this Court's 2009 opinion. See Karlseng v. Cooke, 286 S.W.3d 51, 52–53 (Tex.App.-Dallas 2009, no pet.). Because we do not reach the merits of the dispute, we do not repeat those facts here.

had, within the preceding five years, served as a neutral arbitrator in another arbitration involving appellee's lawyer Harper. Faulkner answered "No" to all other questions posed to him on the disclosure form.

Attorney Brett Johnson of Fish & Richardson first appeared in the arbitration on behalf of appellee four days after Faulkner made his disclosures; he was identified as lead counsel on appellee's claim for relief. Faulkner did not supplement his initial disclosures following Johnson's appearance. Following a five-day arbitration hearing, Faulkner ruled in favor of appellee and awarded appellee approximately $22 million, including more than $6 million in attorney's fees.

Appellee moved to confirm the award. Appellants sought a continuance, arguing they had not had adequate time to develop grounds for vacating the award. Among the grounds appellants wished to investigate was evident partiality, based on Faulkner's undisclosed relationship with Johnson. After appellants offered preliminary evidence concerning their claim of evident partiality, they sought more time to develop their theory, but the trial court denied the continuance and confirmed the arbitration award. They appealed. This Court concluded appellants should have been allowed an adequate opportunity to investigate the evident-partiality issue and, thus, the trial court abused its discretion in denying the continuance. *Karlseng v. Cooke,* 286 S.W.3d 51, 58 (Tex.App.-Dallas 2009, no pet.). We reversed the trial court's judgment confirming the arbitration award and remanded the cause. *Id.*

On remand, the trial court held another evidentiary hearing, which commenced on June 30, 2009. The court and the parties agreed this hearing would be an extension

of the initial continuance hearing. Accordingly, the evidence from the initial continuance hearing was before the trial court along with the evidence presented after remand. Once again, the trial court confirmed the award.

## THE RELATIONSHIP BETWEEN ARBITRATOR FAULKNER AND FISH & RICHARDSON LAWYER BRETT JOHNSON

The record of the hearings held February 22, 2008 and June 30, 2009 provides a description of the nature and development of the relationship between arbitrator Robert Faulkner and Cooke's attorney Brett Johnson. The events are summarized in chronological order, beginning with Johnson's clerkship and continuing well after confirmation of the arbitration award in this case.

### 1. Johnson's clerkship years

Johnson testified about his relationship with Faulkner. He characterized his relationship with Faulkner as a friendship "in a business, professional type of way." The professional, collegial aspect of the relationship began when Johnson clerked for Judge Brown in Sherman, Texas from August 1994 through September 1996. When Johnson began his clerkship, Faulkner was the only magistrate judge for Sherman and Texarkana. Johnson saw Faulkner in the hallway on a weekly basis and would say hello, but they did not socialize during this time.

### 2. Early socializing

Johnson's ex-wife Katie was briefly questioned [3] about Faulkner and the contacts she and Johnson had with Faulkner. After Katie testified that she knew Faulkner, she was asked whether the nature of the relationship between Johnson and

---

3. She appeared under subpoena.

Faulkner was trivial. Katie responded that Johnson and Faulkner were friends and that she and Johnson socialized with Judge Faulkner and his wife Sheila.

Twice during 2002, Johnson, Katie, and their child traveled to Sherman to visit Judge Brown. On one of these trips, Johnson ran into Faulkner, and they exchanged greetings. Johnson testified that he had not visited Sherman with the intent of seeking out Faulkner. Faulkner testified that he did not recall this meeting.

### 3. Private Capital Grille dinner celebrating Faulkner's retirement

When his clerkship ended, Johnson entered private practice. He joined the law firm of Fish & Richardson in 2000. He maintained contact with Judge Brown.

Shortly after Faulkner retired in February 2003,[4] Johnson and Katie invited Faulkner and his wife Sheila to a private dinner at the Capital Grille to celebrate Faulkner's retirement. They discussed Faulkner's future plans concerning his becoming an arbitrator. Faulkner testified that he did not remember this dinner until he heard the opening statements in the hearing to vacate the arbitration award.

Johnson and Katie later divorced. In the fall of 2005, Johnson and his then-girlfriend Kimberly ran into Faulkner and Sheila at a fundraiser. Johnson testified the two couples exchanged greetings and brief introductions. Faulkner testified he remembers the fundraiser and meeting Kimberly.

### 4. Private affair at Arbitrator Faulkner's home and Stonebriar Country Club, February 2006

Johnson married Kimberly in January 2006, and on February 10, 2006, Faulkner hosted and paid for a dinner at the Stonebriar Country Club. Faulkner, Johnson, and their wives were in attendance. Johnson testified that he and Kimberly went to the Faulkners' house before dinner, and either he or Kimberly had a drink while the Faulkners finished getting ready. One purpose of this dinner was to discuss Kimberly's interest in how one became a United States magistrate judge. Kimberly, an attorney, was expecting a child and wondered "how you did that." At some point during the evening, Johnson invited Faulkner to attend a Dallas Mavericks basketball game.

### 5. Numerous business calls and personal emails exchanged between Johnson and arbitrator Faulkner, including those setting up Mavericks game April 2, 2006.

On February 13, 2006, Faulkner sent Johnson an email thanking him for attending the dinner on February 10. Faulkner wrote that he and Sheila enjoyed the visit and that Kimberly was "quite a woman." He also proposed some dates for the Mavericks game and thanked Johnson for inviting him to the game—a "very generous offer." Johnson replied, "Thank you for having us out. We had a terrific time. You and Sheila were the perfect hosts." Johnson said he would get back to Faulkner about the dates and also proposed some dates of his own. Faulkner confirmed that April 2 would be a good day to

---

**4.** Johnson testified that in February 2003 he was invited to and attended Faulkner's retirement party. The formal ceremony was held at the courthouse in Sherman; the reception followed afterward at the Stonebriar Country Club. Johnson testified that his invitation was not unique; rather, all of Judge Brown's former law clerks were invited. Faulkner testified that a multitude of family, friends, and colleagues were invited by his secretarial staff and that he did not recall Johnson's attendance.

attend the Mavericks game. This email series is not unique; the parties often communicated by email. Faulkner used his personal email account; Faulkner, Sheila, and Johnson used their first names. The tone and content of these emails is personal. Johnson acknowledged that he and Faulkner were "friends, generic friends and business colleague friends ... at a minimum." Johnson also estimated that he "talk[s]" to Faulkner "probably six times a year on the telephone" about business.[5]

## 6. Arbitrator Faulkner and wife's recommendations on wineries, restaurants, and marketplaces to visit on Johnsons' California vacation.

On March 1, 2006, Johnson emailed Faulkner, saying, "Judge: Hope all is well. Am leaving for wine country tomorrow and wanted to see what restaurants and vineyards you reccomended [sic]? Looking forward to our Mavs game on 4/2." Faulkner and Sheila each responded. Faulkner replied, "Brett, I will try to get the names of restaurants before you leave if I can, but be sure and stop at the Viansa winery and Italian Marketplace. . . . A fun place to brouse [sic], eat and drink. Bob." Sheila responded, "Brett, this is Sheila. Another favorite restaurant of ours is Mustard's Grill north of Yountsville. . . . Ya'll have a great time!!!!" Faulkner stated that he did not remember any of the conversations in these emails until his wife reminded him. Faulkner testified that he receives numerous emails and may have responded but did not recall responding to any particular emails.

## 7. The Busking arbitration

The so-called Busking arbitration grew out of a pair of lawsuits involving the law firm of Fish & Richardson in roughly mid–2004. The law firm sued a former client and its principals for nonpayment of fees, and the former client filed a separate lawsuit against the law firm and Geoff Harper, an attorney at the law firm, for malpractice. The parties agreed to send their dispute to arbitration. Demand for arbitration was filed in approximately January 2006. Faulkner was the arbitrator. The arbitration hearing was scheduled to begin in April 2006. It would last several days. Terry Garrett represented the former client. Harper apparently appeared as a party defendant and also counsel but did not act as primary legal counsel at the hearing because he was a named defendant. Johnson was a principal at Fish & Richardson at the time. In May 2006, Faulkner rendered his award in the Busking arbitration in favor of Fish & Richardson in the amount of $220,000 for attorneys fees. The award was confirmed on November 20, 2006.

Garrett testified that at some point during the Busking arbitration hearing, Harper told him how he thought Faulkner would rule.[6] Garrett became concerned because the way Harper talked about what Faulkner would do sounded to him like Harper and Faulkner "knew each other pretty well." Garrett immediately sent a written request to Faulkner inquiring into Faulkner's relationship with Harper, "because it seemed they were awfully friendly." Garrett had a phone conversation

---

**5.** The record contains no evidence concerning the nature of the "business" that spurred an average of six calls a year. Johnson did testify that once, when Faulkner had called him about another case, Faulkner asked about the status of the *Karlseng* matter. But that is the single reference we find concerning a specific business call.

**6.** According to Harper's testimony, his conversation with Garrett concerned Faulkner's ruling on a motion for death-penalty sanctions.

about Garrett's letter and was told that Faulkner did not have a relationship with Harper.[7] Garrett testified that at the time of the phone conversation, Johnson had not yet made his appearance in the Busking arbitration, so Garrett did not inquire about any relationship between Johnson and Faulkner. Garrett testified that he did not think he saw Johnson in the case until it was set for arbitration or "maybe even the day of arbitration." Faulkner, Johnson, the law firm, and JAMS never made any disclosures about any relationship between Faulkner and Johnson. According to Johnson, he appeared as counsel shortly before the hearing. He and Faulkner agreed that they should not go to the April 2, 2006 basketball game they had planned, and that it would be the wrong thing to do on the eve of an arbitration hearing. They canceled their plan to attend the game. Johnson did not believe Faulkner should have disclosed their relationship, even though he and his firm were counsel of record in the arbitration and his firm was one of the parties as well. Johnson testified it was appropriate for him to renew contact with Faulkner after the post-award modification period expired.

David Newman, who was one of Fish & Richardson's and Harper's opponents in the Busking arbitration, testified he did not have independent knowledge of the Faulkner–Johnson relationship until learning of the *Karlseng v. Cooke* case before this Court. Newman also testified the attorney-arbitrator relationship would not necessarily have disqualified Faulkner, but

he would have liked to have known about the contacts between the men.

**8. Arbitrator Faulkner's private Tower Club function with Johnson, his wife and child, September or October, 2006.**

Sometime in September or October of 2006—after Faulkner made his award in Busking but before it was confirmed—Faulkner hosted Johnson, Kimberly, and their four-month-old son for a meal at the Tower Club in Dallas.

**9. Emails rescheduling Mavericks game.**

In October, the men exchanged emails rescheduling their earlier plan to attend a Mavericks game. Faulkner wrote: "Brett, thanks for the note. We would love to go with you guys to one of the games, the Dec. 1 date sounds great to us.... We will see you in Galveston. Thanks again. Bob."[8]

**10. Arbitrator Faulkner and wife and Johnsons' sponsored Mavericks game and Capital Grille private dinner.**

On December 1, 2006, the Johnsons and the Faulkners attended the rescheduled Mavericks game and again ate dinner at Capital Grille. The game tickets (paid for by Johnson) had a face value of $1,200. The dinner (also paid for by Johnson) cost approximately $428. After consulting with his wife, Faulkner recalled attending the Mavericks game and having dinner with the Johnsons. Faulkner testified that he

---

7. The record is not entirely clear whether this telephone conversation was with Faulkner or with someone else at JAMS.

8. Johnson and Faulkner separately attended an annual Bar conference in Galveston from October 12–13, 2006. On one of the days of the conference, Johnson and Faulkner ran

into each other and spoke briefly—less than five minutes. Kimberly and Sheila, also in attendance, independently ran into each other as well. Faulkner testified that he attends the Bar conference every year, so he could not confirm that Johnson also attended the conference in 2006.

has attended two other Mavericks games with another attorney, but did not remember the Mavericks game with Johnson until his wife refreshed his memory.

### 11. Johnsons' gift of wine basket to arbitrator Faulkner and wife

Also in December 2006, the Johnsons sent the Faulkners a Christmas card and a basket of wine valued at $75. The Johnsons received a handwritten thank-you card signed by Sheila for the Christmas wine basket. Faulkner testified that he does not recall ever receiving a Christmas card or gift from Johnson; rather, his wife opens and enjoys the Christmas gifts.

### 12. Faulkner selected as arbitrator in Cooke's case. Arbitrator Faulkner made no disclosure of Faulkner–Johnson relationship.

In February 2007, a demand was made for arbitration in appellants' case. The parties agreed to arbitrate under the rules of JAMS. Faulkner was appointed their single arbitrator on April 5, 2007. The JAMS rules require neutral arbitrators to make certain disclosures. The disclosure obligation continues throughout the arbitration process. JAMS Ethical Guideline V recommends that the arbitrator "ensure that he or she has no known conflict of interest regarding the case," and it provides that the arbitrator "should endeavor to avoid any appearance of a conflict of interest." Guideline V.A further recommends the arbitrator "promptly disclose, or cause to be disclosed all matters required by applicable law and any actual or potential conflict of interest or relationship or other information, of which the Arbitrator is aware, that reasonably could lead a

Party to question the Arbitrator's impartiality." Faulkner made certain disclosures using the JAMS form on or around April 5, 2007. He described the disclosure process as a "very quick and hurried event." As previously noted, Faulkner disclosed that he had, within the preceding five years, served as a neutral arbitrator in another arbitration involving appellee's lawyer Harper. Faulkner answered "No" to all other questions posed to him on the disclosure form, including:

- Arbitrator or a member of arbitrator's family has or has had a significant personal relationship with any party or lawyer for a party?
- Arbitrator or arbitrator's family has or has had any other professional relationship with a party or lawyer for party, including as an expert witness or consultant? [9]
- Is there any other matter that [m]ight cause a person aware of the facts to reasonably entertain a doubt that the arbitrator would be able to be impartial?

In the disclosure form signed by Faulkner, he represented he had "made a reasonable effort to inform myself of any matters that could cause a person aware of the facts to reasonably entertain a doubt that as the proposed Arbitrator, I would be able to be impartial. In addition, I have disclosed all such matters to the parties." Similar representations were made to the parties in a JAMS notification letter. Finally, Faulkner affirmed his "responses to the questions . . . are true and correct to the best of my knowledge."

Johnson first appeared in the arbitration shortly after Faulkner made his disclosures, around April 9, 2007. Johnson was

---

9. This question speaks to "any other" professional relationship. The question follows questions requiring the arbitrator to disclose (1) recent service as an arbitrator or mediator for the parties or attorneys, and (2) an attorney-client relationship with the parties or attorneys.

identified as lead counsel on appellee's original claim for relief. Faulkner did not supplement his initial disclosures following Johnson's appearance. Faulkner testified that the reason for his failure to supplement was because he was "kind of hostile that morning to JAMS about the facilities that they put [the parties to the Cooke arbitration] in, and so [he] may not have focused."

**13. Undisputed evidence Arbitrator Faulkner and Johnson acted as "strangers" when they introduced themselves to each other at the Cooke arbitration on or about December 10, 2007**

Appellant Jacques LeBlanc testified that he did not have independent knowledge of the Faulkner–Johnson relationship. Le-Blanc testified that he was talking to the court reporter for the Cooke arbitration about the spelling of his name when Johnson entered the room and moved to his spot. At that point, Faulkner said, "I see we have another attorney or a new attorney ... on the case." Johnson leaned over and said "yes, judge." He reached out his hand and said "Brett Johnson." Faulkner extended his hand and said "Robert Faulkner." LeBlanc testified that at that time it did not strike him as odd because he was completely ignorant of any relationship between Faulkner and Johnson and thought they were strangers, but in light of the testimony, it definitely seemed unusual to him. There was an objection to LeBlanc's testifying as to whether he would have approved Faulkner if he had known of the relationship. The trial court allowed the testimony as some—but not binding—evidence of what an objective person would believe. Le-Blanc testified he would "absolutely not" have approved Faulkner if he had known about his relationship with Johnson. Nei-

ther arbitrator Faulkner nor Johnson contradicted LeBlanc's testimony.

**14. Johnson's temporary suspension of wine-basket gift to arbitrator Faulkner**

That particular year, 2007, Johnson decided not to send a Christmas card or gift to Faulkner because of the pending arbitration. On January 31, 2008, Faulkner ruled in favor of appellee and awarded appellee approximately $14.6 million in damages, attorneys' fees "equal to 45% of the award," and prejudgment interest of about $1.3 million. On February 12, 2008, Faulkner signed an amended award reducing appellee's damage award to approximately $14.3 million, specifying the amount of attorneys' fees as roughly $6.4 million, and again awarding about $1.3 million in prejudgment interest.

**15. Arbitrator Faulkner made no effort to determine whether he should disclose his relationship with Johnson in order to assure his impartiality after Johnson appeared in case**

Faulkner's testimony regarding the Cooke arbitration was significantly limited by the trial court. Faulkner testified that most of his current recollection is a result of having consulted with his wife prior to the hearing on remand or having heard appellants' opening statements in that hearing. The following question was posed to Faulkner: "What efforts did Arbitrator Faulkner make to inform himself or to refresh his memory of his relationship with Brett Johnson when he first saw Brett Johnson come into the arbitration room on the Karlseng arbitration?" Faulkner replied, "I didn't make any." He conceded he "didn't go through any thought process of What do I know, or when did I go or have dinner with [John-

son]?" But when asked if he recognized Johnson when he saw him at the hearing, Faulkner testified: "Oh, yes, sir, absolutely." Johnson confirmed that Faulkner would have remembered him. Johnson was asked, "Is there any way in the world th[at] Judge Faulkner would forget who you are?" and he answered, "No, sir."

### 16. Continuation of Faulkner–Johnson dinners: the $1,000 Mansion dinner, March/April 2008.

Johnson testified that the men's relationship continued after the Cooke arbitration. For example, shortly after the proceeding was over, Faulkner invited the Johnsons and one other couple to join the Faulkners for dinner at the Mansion in Dallas.[10] The bill was estimated to be $1000 for dinner for the three couples. Faulkner testified that after hearing of this event on the first day of the proceedings in the present case, he remembered hosting the dinner at the Mansion and that the dinner was expensive.

### 17. The JAMS New York business development roundtable planned by arbitrator Faulkner, who solicited Fish & Richardson firm's attendance, in spring 2008

In April 2008, Faulkner called Johnson. Faulkner was planning roundtable lunches for JAMS and "wanted to know who in the New York office he should contact regarding inviting anyone from Fish & Richardson who would want to come." Faulkner testified he recalled this phone call to Johnson. Johnson initially characterized the JAMS program as "professional improvement" or "peer review" for JAMS. He later conceded the program "had a business development aspect to it." On

April 25, 2008, Johnson attended one of those lunches at which Faulkner spoke. Johnson testified he said hello to Faulkner at the lunch. Faulkner testified that he did not remember seeing Johnson at this lunch but was sure that Johnson attended because he remembered Johnson's name being on the invitation list.

### 18. Johnson's wine-basket gift to Faulkner and wife resumed

In December 2008, Johnson resumed sending the Faulkners a Christmas card and wine basket. Again, Faulkner testified that he does not recall receiving a Christmas card or gift from Johnson in 2008.

### 19. Testimony regarding the propriety of the nondisclosure of Faulkner and Johnson's relationship

As to whether contacts like those between Johnson and Faulkner should be disclosed, Johnson testified he would not want to know about them as an attorney, but his clients might potentially want to know. Indeed, he testified he could imagine circumstances where clients might want to know some of the contacts between him and Faulkner. And he agreed that if he were his opposing counsel, he would want to know. He testified, hypothetically, if he knew an arbitrator and attorney had planned to attend a basketball game and then canceled the game because of the pending arbitration, he would "probably" tell his client. He "would not affirmatively hide it." He also conceded that he "could see" how clients might want to know about dinners between arbitrators and attorneys, basketball games, and other such contacts.

---

10. In his deposition, Johnson testified the dinner was in February of 2008. At trial, he testified he thought it was "more like March or April." There was no documentation from the dinner.

Harper, appellee's only witness, testified he knew nothing about the Faulkner–Johnson relationship. He asked Johnson to work on this arbitration because "as a team" they had done well on the Busking arbitration. Harper stated that, to the best of his knowledge, he had never had a meal with a full-time neutral arbitrator. He stated that as an attorney there were some contacts on the chronology that he would want to know about. He conceded that some clients would want to know about the kind of relationship evidenced by the chronology; some would not.

Robert Wood, offered as an expert witness, testified to his many years practicing law and teaching arbitration at Texas Tech law school. Under the circumstances described in this case, Wood opined Faulkner had an obligation to disclose his relationship with Johnson as well as Johnson's law firm, Fish & Richardson, under JAMS rules and Texas arbitration practices, the moment Faulkner realized the attorney or his law firm were involved in the arbitration. He also opined Johnson had a similar obligation. Wood further testified he would teach his students to disclose gifts, sports tickets, and expensive meals, which indicate to him that the relationship is more than casual or trivial. Were he serving as an arbitrator, Wood would disclose a relationship that included a Christmas gift valued at $75 and attendance at a sporting event. Wood testified that temporarily stopping the described interactions between arbitrator and lawyer during an arbitration would never justify nondisclosure of the relationship. The relationship must be disclosed regardless of contemporaneous interactions. In Wood's opinion, Faulkner was required to disclose the relationship as soon as Johnson appeared or Faulkner realized Johnson had appeared.[11] Wood also believed that Johnson was required to disclose the nature of his and Faulkner's relationship even if Faulkner did not.

## EVIDENT PARTIALITY

■■ Arbitration of disputes is strongly favored under both federal and Texas law. *Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 898 (Tex.1995). And arbitration awards are entitled to great deference by the courts. *Crossmark, Inc. v. Hazar*, 124 S.W.3d 422, 429 (Tex.App.-Dallas 2004, pet. denied). We review the trial court's decision to confirm an arbitration award de novo, and we review the entire record. *Statewide Remodeling, Inc. v. Williams*, 244 S.W.3d 564, 567 (Tex.App.-Dallas 2008, no pet.). But we may not merely substitute our judgment for that of the arbitrator. *See id.* at 568.

■ Despite the narrowness of review of the award itself, the Texas Legislature has decreed that—on application of a party—a court *shall* vacate an award if the rights of the party were prejudiced by evident partiality of an arbitrator appointed as a neutral arbitrator. TEX. CIV. PRAC. & REM.CODE ANN. § 171.088(a)(2)(A) (West 2011). The supreme court adopted the following test to determine "evident partiality": a neutral arbitrator selected by the parties or their representatives exhibits its evident partiality if he does not disclose facts that might, to an objective observer, create a reasonable impression of the arbitrator's partiality. *Burlington N. R.R. Co. v. TUCO Inc.*, 960 S.W.2d 629, 636 (Tex.

---

11. There was some discussion during Wood's testimony concerning whether ABA and AAA arbitration standards should apply in this case. The parties agreed to arbitrate under JAMS rules, so we look solely to the issues posed by the JAMS disclosure form. Of course, we look to Texas law when analyzing those disclosure issues.

1997).[12]  The court emphasized that "evident partiality is established from the *nondisclosure itself,* regardless of whether the nondisclosed information necessarily establishes partiality or bias." *Id.* (emphasis in original).  This test was explicitly intended to be an "objective" one, with "the consequences for nondisclosure ... directly tied to the materiality of the unrevealed information." *Mariner Fin. Group, Inc. v. Bossley,* 79 S.W.3d 30, 32 (Tex.2002).

■  While the courts have primarily addressed issues related to business and financial transactions, they are not unaware of other important relationships that certainly impact an arbitrator's judgment, such as personal and social relationships. Information about the existence and extent of each of these relationships is essential to the fair and impartial nature of the arbitration process, particularly in view of the substantial discretion invested in an arbitrator to decide both law and facts and the limited appellate review of these decisions. *Commonwealth Coatings Corp. v. Cont'l Cas. Co.,* 393 U.S. 145, 149, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968); *TUCO,* 960 S.W.2d at 633, 635.

■  The supreme court observed that the standard of disclosure mandated in *TUCO* was in accord with Canon II of the Code of Ethics for Arbitrators in Commercial Disputes, a portion of which it quoted:

 A.  Persons who are requested to serve as arbitrators should, before accepting, disclose:

 \* \* \* \* \* \*

 (2) Any existing or past financial, business, professional, family or social relationships which are likely to affect impartiality or which might reasonably

create any appearance of partiality or bias....

*TUCO,* 960 S.W.2d at 636.  The carriers in *TUCO* next approached the type of relationship which must be at issue before the question of "evident partiality" arises. The carriers contended an arbitrator is evidently partial "only if the arbitrator fails to disclose a direct financial or business relationship with a party or its agent." *Id.* at 637 (internal quotations omitted).  Cooke likewise argues the relationship "must involve a pecuniary interest," that a personal/social relationship standing alone is insufficient to create a reasonable impression of the arbitrator's partiality.  The supreme court specifically disagreed with such a restrictive standard. On the contrary, the supreme court stated: "[T]he parties should have access to all information that might reasonably affect the potential arbitrator's impartiality. This could obviously include, for example, *a familial or close social relationship.*" *Id.* at 637 (emphasis added).

Further, this Court's prior opinion recognized the significance of information regarding "a familial or close social relationship" when it cited to this language in *TUCO. See Karlseng v. Cooke,* 286 S.W.3d 51, 56 (Tex.App.-Dallas 2009, no pet.) (citing *TUCO,* 960 S.W.2d at 636); *see also Amoco D.T. Co. v. Occidental Petroleum Corp.,* 343 S.W.3d 837, 843 (Tex.App.-Houston [14th Dist.] 2011, no pet. h.) (quoting *TUCO's* reference to "familial or close social relationship[s]").

■  This standard reflects the supreme court's determination that courts should not involve themselves in evaluations of partiality that are better left to the parties. *TUCO,* 960 S.W.2d at 636.  When choosing

---

12.  The *TUCO* opinion resolved conflicts within Texas and federal courts concerning the proper standard for identifying evident partiality.  *See TUCO,* 960 S.W.2d at 632–37.

Both section 171.088 and *TUCO* date from 1997.  Accordingly we look to Texas authority from that date forward in analyzing the issue before us.

a neutral arbitrator, the parties must weigh the competing factors of the arbitrator's knowledge and experience against his potential conflict. Parties can gauge the neutrality of an arbitrator only if they have access to all the information that could reasonably affect the arbitrator's partiality. *Id.* at 635. When disclosure is complete, the parties can make their determination concerning potential bias before the arbitration begins, a process that is much more desirable than a court's having to make the determination after an award is in place. *See id.* "While a neutral arbitrator need not disclose relationships or connections that are trivial, the conscientious arbitrator should err in favor of disclosure." *Id.* at 637. Finally, the court emphasized the articulated disclosure standard was a continuing obligation of the parties, to extend "during the course of the arbitration proceedings." *Id.*

### ANALYSIS

█ We review the entire record. *See Williams*, 244 S.W.3d at 567. And we view the record from the perspective of an objective observer, to determine whether the relationship should have been disclosed. *See TUCO*, 960 S.W.2d at 636. We do not merely count contacts. Instead, we assess all the contacts between the individuals as evidence of their relationship. JAMS required Faulkner to disclose any significant personal relationship with Johnson, and business relationship with Johnson, and any other facts that might cause a person reasonably to doubt Faulkner's ability to be impartial.

The Faulkner–Johnson relationship appears to have started in 1994 with the occasional contacts of people who work in the same building. Faulkner was a United States Magistrate Judge for a United States District Judge, and Johnson was a law clerk for the same United States Dis-

trict Judge. Thus, they saw each other on a weekly basis. Johnson's clerkship ended in 1996. According to Johnson, their friendship grew over the years. Shortly after Faulkner's formal retirement party, Johnson and his wife took Faulkner and his wife out for a private dinner to celebrate Faulkner's retirement where they discussed Faulkner's future plans to become an arbitrator. In 2005 Johnson divorced and remarried. After that, Faulkner and Johnson ran into each other at seminars and fundraising events, but it is apparent the men also purposefully sought out social interaction with each other. The relationship was not one-sided: both men hosted expensive social events. For example, in 2006, Johnson treated the Faulkners to a dinner and basketball game at a total cost of over $1,600. Their spouses actively participated in their socializing. The contacts among the foursome included drinks at the Faulkners' home as well as career and vacation advice. Johnson sent Christmas gifts to Faulkner.

Moreover, the social relationship between Faulkner and Johnson clearly had business overtones. Johnson testified he spoke to Faulkner about six times a year for business reasons. Faulkner testified, albeit more generally, that he tried whenever possible to take attorneys he was working with or would like to work with to meals at a downtown restaurant. Shortly after the arbitration, Faulkner called Johnson for help in making contacts within Johnson's firm for business-development purposes. This contact, while occurring after the arbitration, does further evidence the nature of the relationship itself.

Under *TUCO*, we must examine this relationship for its effect on an objective observer. Both Newman and LeBlanc testified they would have wanted to know about the relationship. Both Johnson and Harper testified that their clients might

want to know about it as well. Wood's uncontroverted expert testimony was that the relationship should have been disclosed.

■ Cooke contends the arbitrator's lack of knowledge and recollection of specific facts is "decisive" in determining no disclosures were necessary. Cooke relies on arbitrator Faulkner's testimony that he did not recall certain events until his wife refreshed his memory shortly before he gave testimony pursuant to this Court's previous decision. It is beyond any question that an arbitrator has a duty of disclosure. Such a duty is predicated upon the enormous power, responsibility, and discretion vested in the arbitrator and the very limited judicial review of the arbitrator's decisions. So often, significant sums of money are at stake. And, of course, an experienced arbitrator whose livelihood depends upon his reputation and skill, always recognizes there is a competitive market for such services. Thus, the duty of disclosure requires a certain degree of introspective reflection or what is commonly known as due diligence. While an arbitrator need not launch a full investigation into his past, an arbitrator must make a reasonable effort, consistent with the effort and care ordinarily exercised by a person who seeks to satisfy a legal obligation, to inform himself/herself of the interests, contacts, and/or relationships that are required to be disclosed. *Cf. Amoco D.T. Co.,* 343 S.W.3d at 847 n. 7 ("[A]n arbitrator cannot intentionally fail to determine whether information known to him is trivial or material and later claim, when accused of evident partiality, that he was unaware of the nature of the information.").

Our record reflects that when arbitrator Faulkner was given an opportunity to explain what efforts he made to inform himself or refresh his memory as to the relationship he had with Johnson, he responded that he had done absolutely nothing. Faulkner's admission completely undermines the argument Cooke makes in this Court [13] that the arbitrator should not be expected to make any disclosures because he later testified he either did not know or could not recall specific facts until his memory was refreshed by, among others, his wife.

The record establishes that arbitrator Faulkner and Johnson were friends. Both Faulkner and Johnson acknowledged Faulkner would immediately have known who Johnson was the moment he presented himself at the arbitration hearing. Cooke stresses Faulkner testified he did not recall specific times, dates, places, and the like. The record clearly shows Faulkner recalled many of these events when, facing the prospect of giving testimony, he took measures to refresh his memory. The situation called for a simple solution: disclose at a minimum the general nature of his friendship with Johnson, of which appellants were entirely ignorant, and thus permit the parties to further investigate this relationship before proceeding with the hearing. Faulkner failed to make any effort to reflect on the interests, contacts, and relationship he enjoyed for many years with Johnson, in order to assure the appellants of his impartiality and to safeguard the integrity of the arbitration process.

Cooke's reliance on *Mariner Financial Group, Inc. v. Bossley,* 79 S.W.3d 30 (Tex. 2002), is misplaced. In *Bossley,* an appeal from a summary judgment, the arbitrator

---

**13.** Cooke asserts in his appellate brief, "Absent a recollection of these events, Judge Faulkner cannot be condemned for not having disclosed them in connection with the underlying arbitration."

had not disclosed any relationship with an expert witness for the Bossleys, the parties that eventually lost at arbitration. The expert herself only remembered after the arbitration that she had testified against the arbitrator in a malpractice action more than two years earlier. *Id.* at 32. In her affidavit, the expert stated that the arbitrator did not attend her deposition and that she never met or saw the arbitrator before the arbitration; she had no further involvement with the malpractice case against the arbitrator after that deposition. The case was settled and the settlement documents were sealed. The Bossleys alleged evident partiality, and Mariner Financial, the winning party, moved for a traditional summary judgment. The trial court granted the summary judgment. *Id.* The supreme court stated that Mariner Financial had to establish the arbitrator was not evidently partial as a matter of law and concluded there was a fact issue on evident partiality because the summary-judgment record was silent as to whether the arbitrator knew or remembered the expert when he failed to disclose their relationship. *Id.* at 33. Cooke contends *Bossley* supports his argument that Faulkner had no obligation to disclose forgotten contacts. However, JAMS—like *Bossley,* 79 S.W.3d at 35—requires disclosure of relationships. And although Faulkner claimed he had forgotten specific contacts with Johnson, he had not forgotten their relationship. Indeed when asked if he remembered Johnson when Johnson appeared at the arbitration hearing, Faulkner replied that he "absolutely" did. And when Johnson was asked whether there was any way in the world Faulkner would forget who he was, he replied "No, sir." *Bossley* does not support Faulkner's failure to disclose the known relationship he had with Johnson. *TUCO,* however, is a closer fit to the facts and supports appellants' position. In

*TUCO,* the arbitration panel's neutral arbitrator accepted a business referral from a partisan arbitrator's law firm during the arbitration. 960 S.W.2d at 631. In *TUCO,* there was no question the neutral arbitrator knew about the relationship. Similarly, in the instant case, there is no question arbitrator Faulkner knew about his relationship with Johnson.

■ Cooke also argues disclosure is required only if the relationship contains a substantial business or pecuniary aspect, and that social relationships standing alone are insufficient. The Texas Supreme Court has expressly rejected this standard as being too narrow. The duty of disclosure is not limited to direct financial or business relationships. *Id.* at 637. Instead, "the parties should have access to all information that might reasonably affect the potential arbitrator's impartiality." *Id.*

The record in this case reflects substantial evidence of a personal, social, and professional relationship between arbitrator Faulkner and Johnson. This relationship grew over a long period of time, commencing in 1994. It involved private dinners at restaurants and country clubs. The meals were expensive. Cooke's claim that Faulkner "has never been to Mr. Johnson's home" is not compelling in view of the evidence that Johnson and his wife were, in fact, entertained in Faulkner's home. Cooke's claim that neither Johnson nor Faulkner has confided in one another about personal, financial, or career matters nor exchanged gifts (or even cards) is not impressive in view of the evidence that Faulkner discussed his career plans to become an arbitrator with the Johnsons, Johnson and Faulkner did have private telephone conversations about business through the years, the Johnsons did send gifts and cards to the Faulkners, and the Johnsons did have a conversation with the

Faulkners about how one could become a federal magistrate, certainly a discussion with career overtones. They also discussed recommendations about vacation plans.

In addition, we are also troubled by Cooke's blanket assertion that the record shows neither arbitrator Faulkner nor Johnson had any business connections from which "either would derive a pecuniary benefit." The record shows over a period of years both individuals exchanged telephone calls over what was generally described as "business." The record also shows the Busking arbitration was a dispute which involved Fish & Richardson's claim for substantial legal fees. Harper and Johnson were principals of this firm. Opposing counsel testified about concerns that were generated by Harper's remarks as to how Faulkner would rule, which in turn caused opposing counsel to ask Faulkner in writing if he had any sort of relationship with Harper. The evidence shows that while the Busking arbitration was ongoing, Johnson conducted substantial contacts with arbitrator Faulkner in February and September at Faulkner's home and at an expensive restaurant, and Johnson solicited advice from Faulkner regarding Johnson's California vacation plans. A Mavericks basketball game they both planned to attend April 2, 2006 was canceled because of the imminent arbitration hearing. It was rescheduled and took place December 1, 2006, less than two weeks after the award was confirmed. Faulkner ultimately awarded $220,000 in attorneys' fees to Fish & Richardson. Thus, arbitrator Faulkner ruled on the merits of a case involving Fish & Richardson and Harper as parties while engaging in undisclosed, behind-the-scenes social meetings with Johnson, a principal of Fish & Richardson. To this date, Johnson and Fish & Richardson claim they and Faulkner had no duty to disclose these contacts.

In the Cooke arbitration, Faulkner and Johnson presented themselves at the commencement of the arbitration hearing as complete strangers. This attitude was a dramatic turnabout from the friendly attitude exhibited by Fish & Richardson counsel during the prior Busking arbitration. Opposing counsel in the Busking arbitration testified he was caught by surprise to learn of the recently discovered Faulkner–Johnson relationship through evidence developed in the Cooke case. Cooke completely failed to dispute this evidence.

In a case of this magnitude, in which Cooke requested over $6 million in attorneys' fees [14] and in which arbitrator Faulkner and Johnson did not disclose the nature of their relationship, the evidence of the relationship between arbitrator Faulkner and Johnson is particularly alarming. The record also shows the formula for computing attorneys fees sought in the Cooke arbitration was revised shortly before the arbitration hearing. According to Fish & Richardson, after the firm had represented Cooke for over two years, it determined its legal-fee contract was not enforceable and changed the arrangement to a contingency-fee contract. This revision preceded the award of over $6 million to Fish & Richardson.

We further conclude the post-award conduct of arbitrator Faulkner and Johnson is both relevant and enlightening. They engaged in an expensive dinner at the Mansion, said to approach $1,000, immediately after the award; and Johnson resumed his annual wine-basket gift to the Faulkners. Equally important, arbitrator Faulkner solicited Fish & Richardson lawyers to at-

---

14. After the hearing, Cooke submitted a proposed arbitration award. The proposed award included awards of attorneys' fees totaling over $6.5 million.

tend a business-development roundtable in New York in the spring of 2008. This evidence continues to show the same substantial pattern of personal social contacts and potential business relationships.

Our conclusion that the relationship between arbitrator Faulkner and Johnson was significant is further supported by their own conduct during arbitration proceedings. Faulkner and Johnson did not suspend their activities during the Busking arbitration between January and November 2006.[15] Faulkner, Johnson, and their wives had dinner together in February 2006, and Johnson then invited Faulkner to a basketball game. The two men exchanged emails and confirmed April 2, 2006 as the date for their basketball outing. In March, Johnson and the Faulkners corresponded by email about Johnson's vacation plans and the Faulkners' suggestions. Then Johnson and Faulkner agreed to cancel their April 2 basketball outing, which would have been very shortly before the Busking hearing. In September or October 2006, Faulkner hosted Johnson and his family for a meal at the Tower Club in Dallas, and the two men rescheduled their basketball game.

The Cooke arbitration commenced in February 2007 and did not result in a final award until February 2008. There is no evidence of social outings during 2007, but we are mindful of Johnson's testimony that he talked to Faulkner on the telephone probably six times a year on business. Johnson sent the Faulkners a Christmas gift in 2006, refrained from doing so in 2007, and then sent them another Christmas gift in 2008. After Faulkner rendered the amended award in February 2008, he treated the Johnsons to dinner at the Mansion in March or April, and in April he called Johnson for assistance in identifying a Fish & Richardson person to contact about a JAMS roundtable lunch.

Cooke contends contacts such as these are "expected and accepted" among attorneys practicing in the same community. However, Harper testified otherwise, stating he had never had a meal with a fulltime neutral. Further, the test is whether the facts might create a reasonable impression of partiality in the mind of an *objective observer*. The objective observer may include an attorney but it is not limited to an attorney. *See TUCO*, 960 S.W.2d at 636.

■ Our examination of the entire record in this case shows a direct, personal, professional, social, and business relationship between arbitrator Faulkner and Johnson. The facts demonstrating this relationship "might, to an objective observer, create a reasonable impression of the arbitrator's partiality" if not disclosed by the arbitrator. Thus, Faulkner's duty of disclosure was triggered as to that relationship. *See id.* at 639. His failure to disclose the relationship constitutes evident partiality. *See id.* We decide appellants' first issue in their favor.

### CONCLUSION

Because we have resolved the first issue in favor of appellants, we need not address their remaining issues. We reverse the trial court's order confirming arbitration award and judgment, vacate the arbitration award, and remand the case for further proceedings.

---

**15.** The Busking arbitration commenced in January 2006, was heard in April 2006, and resulted in an award in May 2006. The award was judicially confirmed in November 2006.