**AFFIRMED; Opinion Filed April 15, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-01695-CV

**ASHLEY BRIGHAM PATTEN; ROBERT C. KARLSENG; JACQUES YVES LEBLANC; KARLSENG LAW FIRM, P.C.; PATTEN LAW FIRM, P.C. F/K/A PATTEN & KARLSENG, P.C.; AND LEBLANC & KARLSENG, P.C., F/K/A LEBLANC, PATTEN & KARLSENG, P.C., Appellants**

**V.**

**M. BRETT JOHNSON; GEOFFREY HARPER; FISH & RICHARDSON, P.C.; H. JONATHAN COOKE; ROBERT W. FAULKNER; AND JAMS INC. A/K/A JAMS ADR SERVICES, INC., Appellees**

**On Appeal from the 298th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-12-02006**

## OPINION

Before Justices O'Neill, Lang, and Brown
Opinion by Justice Lang

This is an appeal of the trial court's judgment granting appellees' pleas to the jurisdiction and motions to dismiss in a lawsuit filed by appellants following the vacatur of an arbitration award against them. On appeal, appellants present three issues: (1) "[w]hether arbitral immunity poses a jurisdictional bar to any claims factually related to an arbitration against any type of defendant—a litigant, attorneys, a law firm, the arbitrator, and his sponsoring organization—no matter what the scope of the lawsuit's claims and damages"; (2) "[w]hether attorneys are immune from liability when they engage in fraudulent acts for their own financial interests or on

behalf of a client"; and (3) "[w]hether the trial court erred in ruling on the pleas to the jurisdiction before discovery into the extent of the Defendants' fraudulent scheme."

For the reasons described below, we decide against appellants on their third issue. We need not reach appellants' remaining issues. The trial court's judgment is affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The events giving rise to this case include an underlying business dispute, the merits of which are not at issue in this appeal. Following arbitration of that underlying business dispute in 2007, an arbitration award against appellants was rendered by the arbitrator in 2008 and subsequently vacated by this Court. Then, this separate lawsuit, in which appellants assert claims they describe as "factually related" to the arbitration, was filed.

Appellants' second amended petition (the "petition") filed in this case in the trial court below was the live petition at the time of the trial court's ruling dismissing this lawsuit. The petition described the underlying business dispute in detail. We discuss some of the details of the underlying business dispute in order to address the discrete issues in this case. Specifically, the petition stated that prior to 2005, appellants Ashley Brigham Patten, Robert C. Karlseng, and Jacques Yves LeBlanc (collectively, "Patten") and appellee H. Jonathan Cooke were partners in several real estate title service businesses. According to the petition, in approximately 2005, the businesses were "reorganized" by Patten and Cooke "in order to comply with state law." The petition stated that as part of that "reorganization," Patten and Cooke created three law firms, appellants Karlseng Law Firm, P.C.; Patten Law Firm, P.C. f/k/a Patten & Karlseng, P.C.; and LeBlanc & Karlseng, P.C. f/k/a LeBlanc, Patten & Karlseng, P.C. (collectively, the "Law Firms"), and the "business operations" of the real estate title service businesses were then "handled through the Law Firms."

–2–

Appellants stated in the petition that after the "reorganization," a dispute arose respecting Cooke's share of compensation from the businesses. Cooke filed suit against Patten and the Law Firms claiming damages for breach of fiduciary duty and fraud.[1] Initially, appellee Geoffrey Harper of Fish & Richardson, P.C. ("Fish & Richardson") was listed in that suit as Cooke's counsel.

According to the petition, the parties in the underlying business dispute were ordered to arbitrate because their business agreements "contained clauses for arbitration with the American Arbitration Association ("AAA")." Appellants alleged that during negotiations on the scope of the arbitration, Harper "pushed" to use appellee JAMS Inc. ("JAMS")[2] instead of AAA as the arbitration administrator. In February 2007, Harper and counsel for Patten signed an agreement that stated in part that arbitration would be administered by JAMS in accordance with JAMS rules (the "Rule 11 Agreement" or "Arbitration Agreement"). Further, the parties in the underlying dispute entered into an agreement with JAMS (the "JAMS Agreement") for administration of the arbitration. In accordance with JAMS rules, appellee Robert W. Faulkner was selected as the sole arbitrator.

Appellants asserted in the petition that JAMS's arbitrator disclosure form requests potential arbitrators to check "yes" or "no" as to, among other things, whether (1) the arbitrator "has or has had" a "significant personal relationship" or any "professional relationship" with any party or lawyer for a party or (2) there is "any other matter that . . . [m]ight cause a person aware of the facts to reasonably entertain a doubt that the arbitrator would be able to be impartial." According to appellants, "[o]n the same day he was chosen, Faulkner signed his disclosures, only

---

[1] The facts of the parties' underlying business dispute are set forth in more detail in a 2009 opinion of this Court. *See Karlseng v. Cooke*, 286 S.W.3d 51, 52–53 (Tex. App.—Dallas 2009, no pet.); *see also Karlseng v. Cooke*, 346 S.W.3d 85, 86 (Tex. App.—Dallas 2011, no pet.).

[2] The record shows "JAMS" is short for "Judicial Arbitration and Mediation Service."

indicating one prior arbitration with [Fish & Richardson] and Harper and disclosing no other matter."

Four days later, Cooke filed an "original claim for relief" in the arbitration in which he identified appellee M. Brett Johnson, also of Fish & Richardson, as counsel. Further, according to appellants, Cooke asserted (1) additional claims for breach of contract, negligent misrepresentation, conversion, shareholder oppression, and unjust enrichment, and (2) a "damages claim for attorneys' fees." The petition stated Harper testified during the arbitration that "[Fish & Richardson] had a contingent fee agreement with Cooke which was just signed on Thursday, December 6, 2007, less than a week before the arbitration began, giving [Fish & Richardson] a 45% fee plus expenses."

According to the petition,

The arbitrator issued a $22 million award—far larger than Patten thought possible or supported by the evidence—which included $6 million in attorneys' fees . . . . The damages award was approximately $14 million, but rather than award the "contingent" fees as 45% of the damages, Faulkner awarded 145% of the damages, adding the "contingent" fee on top of the total damages. . . . Shocked at the size and terms of the award, Patten began rigorous investigation and discovered that Faulkner and Johnson in fact knew each other. Patten fought confirmation of the award, but after denying Patten an opportunity for discovery of the [relationship between Faulkner and Johnson], the trial court confirmed the award.

Patten and the Law Firms appealed the trial court's confirmation of the arbitration award in this Court. *See Karlseng*, 286 S.W.3d at 51. In April 2009, this Court (1) concluded the trial court had abused its discretion by not granting appellants a continuance to allow an adequate opportunity to investigate whether Faulkner failed to disclose information he had a duty to disclose and (2) remanded the case to the trial court. *Id*. at 58. After further proceedings in the trial court, the case was again appealed in this Court. *See Karlseng*, 346 S.W.3d at 85. In June 2011, this Court (1) concluded Faulkner's failure to disclose the relationship between him and

–4–

Johnson constituted "evident partiality" and (2) vacated the arbitration award and remanded the case for further proceedings. *Id*. at 100.

The case now before us was originally filed in the trial court by appellants ("plaintiffs") against appellees ("defendants") in February 2012, subsequent to vacatur of the arbitration award. The petition also included (1) an extensive recitation of facts[3]; (2) counts of fraud, fraud

---

[3] In addition to the facts already described above, appellants' second amended petition stated in part as follows:

24. Faulkner and Johnson had a social, professional, and business relationship ("the Faulkner-Johnson Relationship"). The Defendants concealed the Faulkner-Johnson Relationship throughout the arbitration and subsequent litigation. Neither Faulkner nor the Attorneys disclosed the Faulkner-Johnson Relationship, when Faulkner ruled on summary judgment briefing that included Johnson's name on the pleadings. They still did not disclose the Faulkner-Johnson Relationship as the arbitration hearing began. Unbelievably, Johnson and Faulkner introduced themselves to each other as though they were strangers in front of LeBlanc. This gesture seemed innocuous to LeBlanc at the time, but later became striking when LeBlanc learned they in fact knew each other, and knew each other well. Faulkner never supplemented his disclosures (as the JAMS Rules and arbitrator ethics require) to indicate that he knew Johnson. The Attorneys and Cooke likewise never disclosed the relationship, despite JAMS' requirement to do so. The failure to disclose the relationship was a material omission.
. . . .
26. At the arbitration hearing Cooke portrayed himself as an unsophisticated nonlawyer who was taken advantage of by his lawyer-partners. He claimed that he was "shocked" at an alleged March 28, 2005, meeting with his lawyer-partners during which they explained that the businesses would be reorganized into law firms in order to comply with state law. Cooke swore that he had no idea as of that date that there were any problems with the way he was compensated or that the companies would have to be restructured. He thought the TDI issue was just "a problem getting a license, period" and that he did not know about the gravity of the TDI audit along with certain other facts. He also insisted that he knew nothing about LKP Management ("LKP"), an entity set up to handle payroll for the business in the hopes of satisfying TDI. Cooke signed an affidavit claiming that LKP was created "without consulting or informing me" and the payroll functions were shifted to LKP "without consulting or informing me." Cooke made these statements with the assistance of the Attorneys.
. . . .
29. In 2008, while Patten's appeal of the arbitration award confirmation was pending, Patten uncovered emails and other communications from archived files demonstrating that Cooke had lied during his testimony as he had known all along about the necessary reorganization of the business into law firms and in fact had himself directed many of the steps to do so (the "Cooke Emails"). Emails from late 2004 and early 2005 — before the purported March 28, 2005, meeting — demonstrate that Cooke not only knew about the gravity of the TDI issues but also fully participated in, if not directed, the set up of LKP and the law firms to restructure the business, and directed payroll payments through LKP. Moreover, Cooke directed transfers of more than one million dollars from the Law Firms — although he claimed he had no knowledge of their existence — to companies in which he had an interest. More than any of the other three partners, Cooke directed and controlled the businesses' various bank accounts. The Cooke Emails include discussions about how to respond to the TDI inquiry, including restructuring payroll and execution of management service agreements to document the relationships among the partners' various business entities with outside counsel.
30. Throughout 2008—after the existence of the Faulkner-Johnson Relationship was exposed—Harper engaged in acts designed to further the fraudulent scheme including threatening the Plaintiffs with criminal charges on multiple occasions. He threatened Patten with bank fraud charges when the Plaintiffs sought to lower their supersedeas bond amounts. He garnished accounts that did not belong to the judgment debtors, including an account for a business belonging to LeBlanc's father, payroll accounts, and an escrow account belonging to the Plaintiffs' nascent business in Corpus Christi. As a result, LeBlanc's father lost business and the Corpus Christi business was so paralyzed by Harper garnishing money belonging the [sic] Patten's customers that it closed soon thereafter. The Attorneys engaged in these acts at a time when they knew their arbitration judgment was itself based on fraudulent acts and would be unlikely to stand which would in turn cost the Attorneys $6 million.
31. In November 2008, while the first appeal was pending, Patten's counsel presented the Cooke Emails as proof of Cooke's lies about his knowledge of the business dealings and problems with TDI to Harper. His response was to accuse Karlseng of a felony and deny his client had ever seen the Cooke Emails. Harper threatened Karlseng with criminal prosecution via email and during informal discussions Karlseng's counsel initiated about the gravity of Cooke's actions. Harper even continued to make representations to the court of appeals directly contrary to the facts and proof Harper now had in his possession that Cooke's testimony and affidavits during the arbitration were false.
32. Karlseng, Patten, LeBlanc, and Cooke had owned a building in San Antonio via a real estate partnership that was part of the dispute in the arbitration as the scope was expanded in the Rule 11 agreement. The building sold by agreement in September 2009. Cooke, with Harper's assistance, waited at the bank during the closing and withdrew

by non-disclosure, "breach of contract (Arbitration Agreement)," and "breach of contract (JAMS Agreement)"; and (3) allegations pertaining to "fraudulent concealment and discovery rule," "participatory and vicarious liability," and conspiracy. Plaintiffs sought "unliquidated damages within the jurisdictional limits of this court," exemplary damages, and attorney's fees "for breach of the contract for arbitration."

---

approximately $57,000 in proceeds that belonged to all four partners. The money never touched Cooke's bank account. Instead, he endorsed the check over to Fish which deposited the funds in Fish's bank account.

33. Throughout 2008 and 2009, as Patten expended hundreds of thousands of dollars for the appeal and in defense of their assets, Harper and Johnson continued to deny that any relationship with Faulkner existed at all. On September 4, 2008, Cooke filed his brief in the court of appeals, signed by Harper and Johnson, calling the allegations of the Faulkner-Johnson Relationship "a fishing expedition," "fanciful," "frivolous," and "pure fiction." At stake in the appeal was not only the award for the Attorneys' client, but also their $6 million award in attorneys' fees from which they would personally profit.

. . . .

35. On remand the trial court significantly limited Faulkner's testimony. However Faulkner still admitted that he "absolutely" recognized Johnson when he walked into the arbitration and that he made no effort to inform himself or refresh his recollection of any relationship with Fish or its lawyers such as Johnson.

36. During deposition and hearing testimony in June 2009, Johnson finally admitted that he did know Faulkner and had actively concealed his relationship with him while any arbitrations were pending before him. Johnson admitted that he and Faulkner had dined at the Capital Grille and at the Mansion on Turtle Creek, sat together in Johnson's floor Mavericks seats, had drinks at the Faulkners' home and had dinner at their country club, among other socializing. Johnson emailed "Bob" Faulkner on his personal email account and corresponded with Faulkner's wife on her personal email account. Johnson's then-current wife joined in this correspondence and accompanied Johnson in many of these social outings with Faulkner. In fact, they even met to introduce their new baby to Faulkner over lunch at the Tower Club.

37. The Faulkner-Johnson Relationship was so personal and familiar that they emailed each other and their wives using first names, and Faulkner using his personal email account. Faulkner emailed Johnson that Johnson's new wife — an attorney who had sought advice from Faulkner on becoming a federal magistrate judge herself — was "quite a woman." The two couples' email banter included scheduling the Faulkners joining the Johnsons at a Dallas Mavericks game and advice about traveling in the Northern California wine country. Faulkner's wife also wrote the Johnsons with a marked familiarity: "Brett, this is Shelia. Another favorite restaurant of ours is Mustard's Grill north of Yountsville . . . . Ya'll have a great time!!!!"

38. Faulkner also sought Johnson's help in promoting his arbitration career—particularly for lucrative intellectual property cases. Not licensed as an attorney in Texas, Faulkner has aggressively promoted himself as an intellectual property arbitrator. To promote his business he relied on his relationship with Johnson and by extension, with Fish. While Karlseng I was pending, Faulkner called Johnson and asked for an introduction to intellectual property litigators in Fish's New York office. Johnson obliged. Faulkner's relationship was rewarded when he was included as part of an IP Law Review seminar's faculty that was chaired by Fish partners in New York.

39. Faulkner's failure to disclose his relationship with Johnson and subsequent deep resistance to coming clean about that relationship served to protect himself and to continue to profit from his relationship with Johnson and Fish by promoting himself as an intellectual property arbitrator.

40. This was not the first time Fish added Johnson to an arbitration pending before Faulkner after he made his disclosures. In 2006, Fish itself sued a former client, Busking, for fees, and the client sued Fish and Harper for legal malpractice (the "Busking Arbitration"). The dispute went to arbitration before Faulkner who did not disclose his relationship with Johnson when Fish was a party. Faulkner failed to update his disclosures when Johnson appeared on the case — even though he had socialized with him during the arbitration itself. Opposing counsel grew suspicious of Harper's familiarity with Faulkner and inquired as to their relationship—too precise a question. Faulkner denied any relationship *with Harper* then ruled in Fish's favor. What Busking and his counsel did not know—because Faulkner and Johnson did not disclose the facts—was that they not only knew each other but had just postponed a date for a Dallas Mavericks game set for the eve of the arbitration rather than disclose their relationship.

41. In sum, the Faulkner-Johnson Relationship was personal, social, and sought mutual profit therefrom. They hosted each other at expensive social events at Capital Grille, the Mansion, Faulkner's home, a private country club, and Mavericks games, with their spouses joining them. Faulkner breached his duty to disclose these contacts despite the enormous power, responsibility, and discretion vested in an arbitrator and the very limited judicial review of arbitration. In both the Busking Arbitration and this case, the Attorneys had a direct financial interest in the outcome. In short, the Attorneys stood to personally profit had their scheme succeeded and personally told lies to further the scheme.

Johnson, Harper, and Fish & Richardson (collectively, the "Attorneys") filed a "Motion to Dismiss for Lack of Jurisdiction and Motion for Summary Judgment." Therein, they asserted in part, "Though cloaked in a variety of state law claims, Plaintiffs' Petition amounts to no more than a collateral attack on the already-vacated arbitration award." According to the Attorneys,

> Plaintiffs have had full relief under the Texas Arbitration Act, which provides their exclusive remedy and preempts their claims. The arbitration award has been vacated, and the dispute will soon be arbitrated again. As a matter of law, Plaintiffs are not entitled to more. Because Plaintiffs' claims are preempted, this Court lacks jurisdiction—power—to do anything other than dismiss.

Additionally, the Attorneys contended (1) plaintiffs' claims against them are "barred by the doctrine of qualified attorney immunity" because "the conduct complained of was within the course and scope of representing a client" and (2) the Attorneys are entitled to summary judgment because plaintiffs' claims "fail as a matter of law" on the merits. Exhibits attached to the motion as evidence included (1) an affidavit of Johnson in which he testified as to basic facts respecting the underlying business dispute and arbitration; (2) the live petition in the underlying business dispute; (3) the Rule 11 Agreement; (4) a copy of JAMS's "Comprehensive Arbitration Rules & Procedures"; and (5) the arbitration award signed by Faulkner in the underlying business dispute.

Cooke filed a "Plea to the Jurisdiction and Subject Thereto, Original Answer" and a "Motion to Dismiss/Summary Judgment for Lack of Jurisdiction and Subject Thereto, Traditional Motion for Summary Judgment." Cooke (1) generally denied plaintiffs' allegations for purposes of his answer and (2) adopted the summary judgment arguments, authorities, and evidence pertaining to the merits of plaintiffs' claims in the motion and exhibits filed by the Attorneys. Further, Cooke asserted in part (1) plaintiffs "filed this lawsuit seeking damages for alleged wrongdoing related to an arbitration award"; (2) "[p]ursuant to Section 171.088 of the Texas Civil Practice and Remedy Code, vacatur of the arbitration award is the **exclusive** remedy

for challenging such conduct" (emphasis original); and (3) "[t]his Court has no jurisdiction to review further complaints about the arbitration process."

Faulkner and JAMS, collectively, filed a general denial answer and a plea to the jurisdiction. They asserted in part the trial court lacks jurisdiction because (1) "arbitrators (like Faulkner) and their sponsoring organizations (like JAMS) are immune from liability to arbitration litigants (like Plaintiffs) for claims arising from conduct that purportedly compromised an arbitration award, regardless how they are labeled" and (2) "the Texas Arbitration Act, TEX. CIV. PRAC. & REM. CODE § 171.088, provides the exclusive remedy for vacating an arbitration award" and "preempts Plaintiffs' claims, regardless of how they are labeled."

Plaintiffs filed a "unified response" to defendants' pleas and motions described above. In that response, plaintiffs asserted in part

> The Defendants' scheme revolved around taking advantage of the Faulkner-Johnson Relationship to obtain large sums of money for both Cooke and the Attorneys through their late-added contingent fee. The Defendants' acts to further the goals of and to cover up their schemes continued after the arbitration ended in December 2007. . . . [Plaintiffs] seek[] a remedy, not of avoiding an arbitration award, but of recovering damages incurred as a result of Defendants' fraudulent acts and breaches of contracts including the legal fees incurred during the arbitration, protecting assets Fish and Cooke wrongfully sought to seize to satisfy the ill-gotten judgment, and defending against Harper's threats of criminal prosecution, along with losses incurred from the destruction of business arising out of the Attorneys' acts.

Further, plaintiffs argued "[s]ection 171.088 does not 'preempt' the field of disputes related to arbitration no matter what the factual basis or claims made," but rather "is the only mechanism to vacate an arbitration award itself." According to plaintiffs, because the award in this case has already been vacated, section 171.088 is "inapplicable and irrelevant." Additionally, plaintiffs asserted "[b]oth Faulkner and the Attorneys engaged in acts foreign to their professional duties" and thus any arbitral or attorney immunity is inapplicable. Numerous exhibits were attached to

plaintiffs' response, including, among other things, deposition testimony and transcripts of proceedings in the underlying business dispute.

Prior to the hearing on defendants' pleas to the jurisdiction and motions for dismissal and summary judgment, plaintiffs filed (1) a motion for continuance "in order to allow time to secure discovery that is needed to adequately respond to the Defendants' Motions" and (2) a motion to compel discovery. Plaintiffs asserted in part

> All Defendants claim that Section 171.088 of the Texas Civil Practice & Remedies Code "preempts" [Plaintiffs'] claims for breach of contract and fraud because they are related to an arbitration. Defendants assert that Section 171.088 is an exclusive remedy for any claim related to an arbitration, citing cases that analyze avoiding collateral attacks on pending arbitration awards and arbitral immunity. But (1) [Plaintiffs are] not collectively attacking an arbitration award— rather, [Plaintiffs] seek[] damages for the costs of the fraudulent arbitration itself, and (2) arbitral immunity is not so cut and dried and depends on the facts surrounding an arbitrator's actions.

(citations omitted). Further, plaintiffs stated in part, "None of the jurisdictional pleas or immunities plead by the defendants is absolute. Thus, each depend[s] on the exact facts committed by each of the defendants." Attached to plaintiffs' motion was an affidavit in which plaintiffs' counsel testified in part

> 7. [Plaintiffs] cannot present by affidavits facts essential to justify the opposition to the Dispositive Motions and need[] additional time to take the deposition of the defendants M. Brett Johnson, Geoff Harper, Jonathan Cooke, Robert Faulkner, and a JAMS representative about their acts, omissions, and communications underlying the claims in this case.

> 8. [Plaintiffs] must secure testimony from this [sic] witness regarding issues such as what Harper and Johnson knew about Cooke's perjury during the arbitration, whether they assisted him, and what still undisclosed acts the attorneys and Faulkner engaged in to conceal the Faulkner-Johnson Relationship so that the defendants could profit from it.

> 9. This evidence is material to the defendants' defense of immunity which [Plaintiffs] seek[] to defeat and to [Plaintiffs'] claims for fraud and breach of contract.

Faulkner and JAMS, collectively, and the Attorneys filed motions seeking a protective order respecting plaintiffs' discovery requests. Specifically, the Attorneys asserted in part

> All conduct of which Plaintiffs complain occurred in the context of an arbitration—by lawyers representing a client, by a witness testifying, and by an arbitrator making disclosures. . . .
> In seeking summary disposition, Defendants do not contest Plaintiff's factual allegations. Defendants' dispositive motions raise questions of law, not fact. Plaintiffs do not need discovery to oppose the motions.

Following a hearing on defendants' pleas to the jurisdiction and motions to dismiss and plaintiffs' discovery-related motions, the trial court concluded it "lacks subject-matter jurisdiction over Plaintiffs' claims" and dismissed this case without prejudice. This appeal timely followed.

## II. JURISDICTION

### A. Standard of Review

The absence of subject matter jurisdiction may be raised by a plea to the jurisdiction or various other procedural vehicles. *See, e.g.*, *In re I.I.G.T.*, 412 S.W.3d 803, 805–06 (Tex. App.—Dallas 2013, no pet.); *City of Dallas v. Heard*, 252 S.W.3d 98, 102 (Tex. App.—Dallas 2008, pet. denied). "Whether the trial court has subject matter jurisdiction is a question of law, which we review de novo." *Heard*, 252 S.W.3d at 102 (citing *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)).

In performing our review, we do not look to the merits of the plaintiff's case, but consider only the pleadings and the evidence pertinent to the jurisdictional inquiry. *Rawlings v. Gonzalez*, 407 S.W.3d 420, 425 (Tex. App.—Dallas 2013, no pet.). "[W]e construe the pleadings liberally in favor of the plaintiff and look to the plaintiff's intent." *Heard*, 252 S.W.3d at 102 (citing *Miranda*, 133 S.W.3d at 226–27). "The plaintiff has the burden to plead facts affirmatively showing the trial court has subject matter jurisdiction." *Id.* (citing *Miranda*, 133 S.W.3d at 226). The defendant then has the burden to assert and support, with evidence, its contention that the

–10–

trial court lacks subject matter jurisdiction. *Id*. (citing *Miranda*, 133 S.W.3d at 228). "If it does so, the plaintiff must raise a material fact issue regarding jurisdiction to survive the plea to the jurisdiction." *Id*. (citing *Miranda*, 133 S.W.3d at 228). "If the evidence creates a fact issue concerning jurisdiction, the plea to the jurisdiction must be denied." *Id*. at 103 (citing *Miranda*, 133 S.W.3d at 227–28). "If the evidence is undisputed or fails to raise a fact issue concerning jurisdiction, the trial court rules on the plea to the jurisdiction as a matter of law." *Id*. (citing *Miranda*, 133 S.W.3d at 228).

We apply an abuse-of-discretion standard of review to a trial court's decision on whether to grant a continuance of a hearing to allow additional discovery. *See Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004); *Klumb v. Houston Mun. Emp. Pension Sys.*, 405 S.W.3d 204, 227 (Tex. App.—Houston [1st Dist.] 2013, pet. filed). A trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Joe*, 145 S.W.3d at 161. There is no abuse of discretion in a case in which the trial court could reasonably conclude additional discovery was unnecessary and irrelevant to the legal issues in the case. *See id*.; *Klumb*, 405 S.W.3d at 227.

### B. Applicable Law

"Arbitration is generally a contractual proceeding by which the parties to a controversy, in order to obtain a speedy and inexpensive *final disposition* of the disputed matter, select arbitrators or judges of their own choice, and by consent submit the controversy to these arbitrators for determination." *Blue Cross Blue Shield of Tex. v. Juneau*, 114 S.W.3d 126, 134 (Tex. App.—Austin 2003, no pet.) (emphasis original) (citing *Manes v. Dallas Baptist Coll.*, 638 S.W.2d 143, 145 (Tex. App.—Dallas 1982, writ ref'd n.r.e.)). "Arbitration of disputes is strongly favored under both federal and Texas law." *Cambridge Legacy Grp., Inc. v. Jain*, 407

S.W.3d 443, 447 (Tex. App.—Dallas 2013, pet. denied) (citing *Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 898 (Tex. 1995)).

Chapter 171 of the Texas Civil Practice and Remedies Code, titled "General Arbitration," is referred to as the "Texas Arbitration Act" ("TAA"). TEX. CIV. PRAC. & REM. CODE ANN. §§ 171.001–.098 (West 2011); *see Valerus Compression Servs., LP v. Austin*, 417 S.W.3d 202, 205 n.1 (Tex. App.—Houston [1st Dist.] 2013, no pet.). Section 171.088 of the TAA provides in part

> (a) On application of a party, the court shall vacate an award if:
>
> > (1) the award was obtained by corruption, fraud, or other undue means;
> >
> > (2) the rights of a party were prejudiced by:
> >
> > > (A) evident partiality by an arbitrator appointed as a neutral arbitrator;
> > >
> > > (B) corruption in an arbitrator; or
> > >
> > > (C) misconduct or wilful misbehavior of an arbitrator;
> >
> > (3) the arbitrators:
> >
> > > (A) exceeded their powers;
> > >
> > > (B) refused to postpone the hearing after a showing of sufficient cause for the postponement;
> > >
> > > (C) refused to hear evidence material to the controversy; or
> > >
> > > (D) conducted the hearing, contrary to [various sections in the TAA], in a manner that substantially prejudiced the rights of a party; or
> >
> > (4) there was no agreement to arbitrate, the issue was not adversely determined in a proceeding under Subchapter B [which pertains to proceedings to compel or stay arbitrations], and the party did not participate in the arbitration hearing without raising the objection.

–12–

TEX. CIV. PRAC. & REM. CODE ANN. § 171.088.[4]  "[A]n application to vacate the award for an arbitrator's alleged misrepresentation or failure to disclose a relationship is the exclusive remedy under the arbitration act." *Juneau*, 114 S.W.3d at 136; *see also Yazdchi v. Am. Arbitration Ass'n*, No. 01-04-00149-CV, 2005 WL 375288, at *4 (Tex. App.—Houston [1st Dist.] Feb. 17, 2005, no pet.) (mem. op.) (concluding lawsuit against arbitrator based on claim for damages resulting from "false [a]rbitration" was preempted by section 171.088).  "Absent a statutory ground to vacate or modify an arbitration award, a reviewing court lacks jurisdiction to review other complaints about the arbitration, including the sufficiency of the evidence supporting the award." *Juneau*, 114 S.W.3d at 135.

## *C. Analysis*

We begin with appellants' third issue, in which they contend "the trial court erred in ruling on the pleas to the jurisdiction before discovery into the extent of the Defendants' fraudulent scheme."[5]  Appellants argue in part in their brief in this Court that "[t]he trial court appears to have found a lack of subject matter jurisdiction based solely on the Defendants' jurisdictional TAA 'preemption' argument, one of many issues before the court, although the

---

[4] The Federal Arbitration Act ("FAA") contains a similar provision. *See* 9 U.S.C.A. §§ 1–16 (West, Westlaw through April 10, 2014).  Specifically, section 10 of the FAA provides in part

> (a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
>
>> (1) where the award was procured by corruption, fraud, or undue means;
>>
>> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>>
>> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>>
>> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C.A. § 10; *see also Cambridge Legacy Grp., Inc.*, 407 S.W.3d at 447 (FAA preempts contrary state law respecting substantive issues).

[5] The headings and discussion in the "Argument" section of appellants' brief in this Court do not directly correspond to their stated issues described above.  Based on the content of appellants' argument in their appellate brief, we construe their third issue to complain as to the trial court's granting of the pleas to the jurisdiction as well as to the timing of that ruling. *See* TEX. R. APP. P. 38.1(f) ("The statement of an issue or point will be treated as covering every subsidiary question that is fairly included.").

arguments below sometimes intertwined arbitral and qualified attorney immunity." Further, appellants state

> The trial court found a jurisdictional bar to claims against an arbitrator, his sponsoring organization, attorneys, and a litigant that is neither granted by the language of the TAA nor the persuasive case law on arbitral immunity. Even if this jurisdiction or the Supreme Court of Texas were to adopt this jurisdictional theory to protect arbitrators from any arbitration-related claims, and not just avoidance of an arbitration award itself, the protection does not extend to attorneys and litigants.

According to appellants, "[Plaintiffs'] claims and damages, and the facts underlying them, are far broader in scope than and do not attack the Arbitration Award." Specifically, appellants contend in part (1) "Johnson and Faulkner *actively* concealed their social, business, and personal relationship, and, as a result, an arbitration award issued where Fish, Johnson, and Harper would financially benefit" (emphasis original); (2) "[i]nformation [Plaintiffs] discovered during the pendency of those appeals indicates that Cooke perjured himself with the apparent assistance of the Attorneys and Defendants' fraudulent acts continued after the 2007 arbitration in order to protect their scheme and their hope of profiting from it"; and (3) "JAMS and Faulkner failed to provide the neutral arbitration Patten had contracted and paid for and that JAMS promised to provide." Additionally, appellants argue (1) "[n]either the language of the TAA itself nor the cases prohibiting collateral attacks on arbitration awards 'preempt' or provide a single 'exclusive remedy' for all claims however remotely related to an arbitration" and (2) because they are "not attacking an arbitration award here, collaterally or otherwise," section 171.088 and *Juneau* "are inapplicable and pose no bar to [plaintiffs'] claims."

> Finally, in their reply brief in this Court, appellants state in part

> This is not a lawsuit based on the facts that support vacatur of an arbitration award for evident partiality—the passive failure to disclose. This lawsuit is based on the cover up of a cover up, based in turn on facts that occurred after the failure to disclose and after the December 2007 arbitration proceeding itself. . . . The damages sought are far broader than those at issue in the Cooke Arbitration—

–14–

whether and to what extent Cooke has an interest in the now defunct title servicing partnerships.

Appellees respond in part

Appellants' allegations concern actions taken and omissions made in obtaining the award or trying to keep it. Their causes of action—for fraud and breach of contract—only address arbitration conduct. Courts uniformly hold that vacatur is the exclusive remedy for complaints about arbitrations, including complaints like Appellants.'

Additionally, according to appellees, (1) "[b]ecause all of Appellants' causes of action come from the arbitration, all alleged damages must come from the arbitration" and (2) "[t]he pervasive regulatory schemes found in the [TAA] and the [FAA] preempt any remedy other than vacatur, which the TAA and FAA expressly provide."

Having laid out the assertions of the parties respecting "preemption," we analyze the applicable authorities. We begin with the *Juneau* case. *See Juneau*, 114 S.W.3d at 126. In *Juneau*, a three-member arbitration panel rendered an award against Blue Cross Blue Shield of Texas ("Blue Cross") in favor of HealthCor Liquidation Trust ("HealthCor"). *Id*. at 128. Blue Cross filed suit to vacate the award, naming HealthCor and the individual arbitrators, including James J. Juneau, as defendants. *Id*. Subsequently, Blue Cross settled its claims against HealthCor and nonsuited two of the arbitrators, leaving only Juneau. *Id*. at 129. In a supplemental petition, Blue Cross alleged Juneau had failed to disclose a prior relationship with a HealthCor attorney involved in the arbitration process. *Id*. Further, Blue Cross argued that, had it known of the relationship before arbitration began, Blue Cross would have sought Juneau's disqualification. *Id*. Blue Cross contended Juneau had engaged in "intentional or negligent misrepresentation." *Id*. at 134. Juneau filed a plea to the jurisdiction, which the trial court granted. *Id*. at 128. The Third Court of Appeals in Austin affirmed. *Id*. at 128.

On appeal, Blue Cross argued in part that in its lawsuit against Juneau, it was not seeking to vacate or modify the arbitration award, but "desires 'to recover . . . the attorney's fees and

expenses incurred' as the result of discovering and briefing Juneau's 'nondisclosure/misrepresentation.'" *Id.* at 133–34. The court of appeals stated in part, "Absent a statutory ground to vacate or modify an arbitration award, a reviewing court lacks jurisdiction to review other complaints about the arbitration, including the sufficiency of the evidence supporting the award." *Id.* at 135. Additionally, the court of appeals reasoned in part

> A suit against an individual arbitrator is not contemplated by the arbitration act. To permit a cause of action against an arbitrator, in addition to the possibility of vacating the award, would contravene the purpose of arbitration. Speed, cost savings, and a final determination would no longer characterize an arbitration proceeding. Instead, a disgruntled party could circumvent the act and seek relief outside the statutory limitations, rendering meaningless the notion that parties can contract to be bound to an arbitrated judgment. In light of the [TAA's] purpose, its procedures to vacate an arbitration award, and the strong deference afforded arbitration judgments, we hold that an application to vacate the award for an arbitrator's alleged misrepresentation or failure to disclose a relationship is the exclusive remedy under the arbitration act.

*Id.* at 136.

Appellants argue (1) *Juneau* is not binding on this Court, but rather is merely persuasive authority and (2) "[a]llowing an absolute bar to an arbitration-related lawsuit, as the trial court's dismissal has done," is "contrary to the public policy of safeguarding the integrity of arbitration." Further, appellants assert "[t]he jurisdictional component of the *Juneau* holding is premised on whether a statutory ground to vacate or modify an award exists." According to appellants, because they "do[] not contest any arbitration award with this lawsuit, directly or indirectly," "the holding of *Juneau* and its progeny is not applicable and poses no bar, jurisdictional or otherwise, to [plaintiffs'] claims." Additionally, appellants contend *Juneau* did not address, and there is no Texas law granting, "jurisdictional protection to attorneys and litigants."

We address appellants' contentions as to preemption in four points. First, the court of appeals' reasoning in *Juneau* (1) recognized that parties are not without remedy under the TAA when impartiality is compromised and (2) addressed specific policy concerns pertaining to

–16–

arbitration, including speed, cost savings, and finality. *Id*. at 136. We agree with and adopt the principle stated in *Juneau* that "[a]bsent a statutory ground to vacate or modify an arbitration award, a reviewing court lacks jurisdiction to review other complaints about the arbitration." *See id*. at 135; *see also Yazdchi*, 2005 WL 375288, at *4; *Pisciotta v. Shearson Lehman Bros., Inc.*, 629 A.2d 520, 525 (D.C. 1993) ("Allowing parties to arbitration to secure [arbitration's advantages] and yet to pursue damages in court for alleged unfairness in the arbitration process would, we conclude, exceed the limited scope of proper judicial intervention in this area.").

Second, we disagree with appellants that *Juneau* is applicable only where a party is seeking to vacate or modify, "directly or indirectly," an existing arbitration award. Appellants argue the court of appeals in *Juneau* "viewed the lawsuit for what it was in substance—a collateral attack on the award—and an attempt to circumnavigate Section 171.088's provisions." However, as described above, Blue Cross argued in part that it was not seeking to vacate or modify the arbitration award against it, but "desires 'to recover . . . the attorney's fees and expenses incurred' as the result of discovering and briefing Juneau's 'nondisclosure/misrepresentation.'" *Juneau*, 114 S.W.3d at 133–34. The court in *Juneau* observed that (1) in its original petition, Blue Cross sought to vacate or modify the award, (2) Blue Cross argued in its supplemental petition that "Juneau engaged in intentional or negligent misrepresentation and that the award should be modified or vacated," and (3) both the original and supplemental petitions filed by Blue Cross requested "such other relief, both legal and equitable, to which [Blue Cross] may show itself justly entitled." *Id*. at 134. Also, the court of appeals stated in a footnote, "At oral argument, Blue Cross argued that such general prayer permits its suit for damages associated with Juneau's nondisclosure." *Id*. at 134 n.4. The court of appeals did not specifically address that argument of Blue Cross. Nor did the court of appeals limit its reasoning or holding to collateral attacks on existing arbitration awards. *See id*. at 136.

Third, although *Juneau* involved only claims against an arbitrator, the Third Court of Appeals' statement that "[a]bsent a statutory ground to vacate or modify an arbitration award, a reviewing court lacks jurisdiction to review other complaints about the arbitration" was not, on its face, limited to complaints respecting arbitrators. *See id*. at 135. Further, the same policy concerns addressed in *Juneau*, i.e., speed, cost savings, and finality, are implicated regardless of who is named as a defendant in "complaints about the arbitration." *See id*. at 136.

Additionally, to the extent appellants' argument on appeal can be construed to assert that the TAA does not preempt claims that fall outside the scope of any arbitral or attorney immunity, we disagree. The doctrine of "immunity" respecting persons involved in an arbitration is separate and independent of "preemption" of claims by the TAA. *See id*. at 133 (stating in section titled "Preemption" that "[e]ven if Juneau is not protected by the doctrine of arbitral immunity, Blue Cross's appeal still fails"). Therefore, we conclude the scope of any arbitral or attorney immunity is not material in determining whether such preemption applies.

Finally, in a letter brief filed in this Court several hours before submission, appellants assert the Second Court of Appeals in Fort Worth recently "allow[ed] a husband's claims against his ex-wife to proceed outside the court of continuing jurisdiction over the divorce because they concerned post-divorce acts." *See Byrd v. Vick, Carney & Smith, LLP*, 409 S.W.3d 772, 775–76 (Tex. App.—Fort Worth 2013, pet. filed). Appellants argue they likewise seek to "pursue claims concerning facts and injuries that occurred after and outside the arbitration leading to the now-vacated award." *Byrd* involved a husband's claims for "damages based on alleged wrongful conduct by [his former wife] during and after divorce proceedings." *Id*. The court of appeals in that case concluded the claims in question were not "claims attempting to enforce the terms of the decree" and therefore were not "enforcement claims for which the divorce court has exclusive, continuing jurisdiction" under the Texas Family Code. *Id*. at 776. Unlike the case

before us, *Byrd* did not involve the issue of whether claims were preempted under an arbitration statute. Therefore, we do not find *Byrd* persuasive.

Now, we consider appellants' argument that the trial court erred by not allowing additional discovery before ruling on appellees' pleas to the jurisdiction. Appellants contend in part in their brief in this Court that because "immunity is qualified and fact-based" and "[plaintiffs] allege[] a fraudulent scheme" by defendants that would preclude immunity, this case "is not subject to summary dismissal on jurisdictional grounds" and "[t]hus, discovery is warranted." Further, the record shows that in their motion for continuance, appellants (1) sought discovery respecting "exact facts committed by each of the defendants" and (2) described how such evidence relates to "immunity." Appellants did not contend in their motion for continuance, nor do they contend on appeal, that such evidence might pertain to preemption by the TAA, which, as described above, is a jurisdictional issue separate and independent from immunity. Specifically, appellants do not address how the discovery sought by them could have raised a material fact issue as to whether their claims are not "about the arbitration" and therefore not preempted. *See Juneau*, 114 S.W.3d at 135. On this record, we conclude the trial court did not abuse its discretion by not allowing the additional discovery requested by appellants. *See Joe*, 145 S.W.3d at 162 (no abuse of discretion in denying continuance where party seeking continuance failed to describe discovery that could have raised fact issue on matter in question); *Klumb*, 405 S.W.3d at 227 (same).

In the trial court, appellees accepted the factual allegations in the petition as true, so the relevant evidence was undisputed. *See Miranda*, 133 S.W.3d at 228. Further, the record shows each of appellants' claims is dependent upon events and/or conduct pertaining to the arbitration in the underlying business dispute. Therefore, on this record, we conclude appellants' complaints are "about" the arbitration in the underlying business dispute. *See Juneau*, 114

S.W.3d at 135.  Consequently, because appellants' complaints in this case did not present "a statutory ground to vacate or modify an arbitration award," the trial court lacked jurisdiction to review those complaints.  *See id*.  Thus, we conclude the trial court properly granted appellees' pleas to the jurisdiction.

We decide against appellants on their third issue.

### III. CONCLUSION

We decide appellants' third issue against them.  We need not address appellants' remaining issues.  The trial court's judgment is affirmed.


<u>/ Douglas S. Lang/</u>
DOUGLAS S. LANG
JUSTICE


121695F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ASHLEY BRIGHAM PATTEN; ROBERT
C. KARLSENG; JACQUES YVES
LEBLANC; KARLSENG LAW FIRM,
P.C.; PATTEN LAW FIRM, P.C. F/K/A
PATTEN & KARLSENG, P.C.; AND
LEBLANC & KARLSENG, P.C., F/K/A
LEBLANC, PATTEN & KARLSENG, P.C.,
Appellants

On Appeal from the 298th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-12-02006.
Opinion delivered by Justice Lang, Justices
O'Neill and Brown participating.

No. 05-12-01695-CV      V.

M. BRETT JOHNSON; GEOFFREY
HARPER; FISH & RICHARDSON, P.C.;
H. JONATHAN COOKE; ROBERT W.
FAULKNER; AND JAMS INC. A/K/A
JAMS ADR SERVICES, INC., Appellees

In accordance with this Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

It is **ORDERED** that appellees M. Brett Johnson; Geoffrey Harper; Fish & Richardson,
P.C.; H. Jonathan Cooke; Robert W. Faulkner; and JAMS Inc. a/k/a JAMS ADR Services, Inc.
recover their costs of this appeal from appellants Ashley Brigham Patten; Robert C. Karlseng;
Jacques Yves LeBlanc; Karlseng Law Firm, P.C.; Patten Law Firm, P.C. f/k/a Patten &
Karlseng, P.C.; and LeBlanc & Karlseng, P.C., f/k/a LeBlanc, Patten & Karlseng, P.C.

Judgment entered this 15th day of April, 2014.



/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE