**AFFIRM; Opinion Filed October 14, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-00524-CV

### JERRY KILLINGSWORTH, Appellant

### V.

### THE HOUSING AUTHORITY OF THE CITY OF DALLAS, Appellee

**On Appeal from the 134th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 09-08714**

## OPINION
Before Justices Bridges, O'Neill, and Brown
Opinion by Justice Brown

This appeal arises out of Jerry Killingsworth's contention that the Housing Authority of the City of Dallas (DHA) backed out of a deal to hire him as the DHA's President and Chief Executive Officer. Killingsworth claims that despite having a written employment contract offering him the position, the DHA yielded to political pressure to retain then-DHA President Ann Lott and refused to allow him to assume the duties of the position. He sued the DHA for breach of an employment contract and violations of his civil rights.[1]

---

[1] *See* 42 U.S.C.A. § 1983; 42 U.S.C.A. § 1981.

After an interlocutory appeal related to the trial court's denial of the DHA's plea to the jurisdiction[2] and additional discovery, the DHA moved for summary judgment on Killingsworth's claims. The trial court granted the motion in its entirety and signed a final judgment that Killingsworth take nothing on his claims. Killingsworth appeals. In his first three issues, Killingsworth contends the trial court erred in granting summary judgment for the DHA because he raised fact issues on each of his claims. In two additional issues, he maintains the trial court erred when it entered a no-evidence summary judgment before the completion of discovery and prohibited discovery of statements made by the members of the DHA Board of Commissioners while in executive session. We conclude the trial court properly granted summary judgment on Killingsworth's claims and did not err in granting summary judgment before discovery was completed and limiting discovery related to closed meetings. Accordingly, we affirm the trial court's judgment.

## Factual Background

The claims at issue in this appeal (and the dispute in the interlocutory appeal) have their genesis in a letter agreement dated November 21, 2006 from DHA Board Chairman Guy Brignon to Killingsworth. The letter begins by stating that "[t]he Board of Commissioners of the [DHA] is pleased to extend you this contract of employment as the President and Chief Executive Officer and Secretary of the Board of Commissioners of the DHA." The letter sets forth the employment terms, including a description of the job duties and details related to compensation and benefits. And it concludes by informing Killingsworth that "[t]he terms of this agreement are nonbinding unless signed by the Chairman of the Board of Commissioners of

---

[2] The DHA contested the trial court's subject-matter jurisdiction over Killingsworth's breach-of-contract claim. We affirmed the trial court's order denying the DHA's plea to the jurisdiction. *See Hous. Auth. of the City of Dallas v. Killingsworth*, 331 S.W.3d 806, 808 (Tex. App.—Dallas 2011, pet. denied).

the Dallas Housing Authority and approved by the Board of Commissioners." The agreed start date was January 3, 2007.

Killingsworth claimed that in the month leading up to the November 21 letter agreement, he met with each member of the Board of Commissioners, who at that time were Brignon, Roderick Washington, and Jose Velazquez,[3] and that each Commissioner supported him for the position. Killingsworth also claimed that based on that support, he negotiated the terms under which he would accept the position through a series of meetings and phone calls with Brignon and a lawyer.

A draft of the letter agreement was provided to the Commissioners as part of the hearing packet for a special Board meeting held on November 20. The minutes from the November 20 meeting reflect an announcement by Brignon that after the Commissioners' closed session, they "may hear discussion and consideration of a resolution" to authorize the Chairman "to effectuate a CEO employment contract." The minutes do not reflect that any discussion or consideration of that resolution occurred after the closed, executive session. But according to Killingsworth, Brignon twice told him that the Commissioners voted to approve the agreement during the executive session of the November 20 special meeting. Brignon presented the letter agreement to Killingsworth on November 21. Killingsworth signed and returned the agreement that same day. Less than two weeks after signing the letter agreement, Killingsworth resigned from his position with the City of Dallas Housing Department even though Brignon advised against it because the agreement still required Board approval.

The Commissioners planned to vote publicly to approve the letter agreement at a special meeting of the Board of Commissioners on December 5. The minutes from the December 5

---

[3] At that time, the Board of Commissioners had two vacancies. According to the DHA's by-laws, the DHA is governed by five Commissioners, who are appointed by the mayor. The by-laws required at least one Commissioner to be a person who is directly assisted by the DHA.

meeting, however, reflect that instead of conducting a public vote to approve the agreement, the Commissioners heard comments from members of the community, including certain community leaders and former Board Commissioners, who urged the Commissioners to wait to make a decision about replacing Lott until the Board had full representation. In particular, the community leaders expressed concern that a tenant representative had yet to be appointed by the mayor despite the position being open for several years. The community members also expressed support and appreciation for Lott and her leadership. At the conclusion of the December 5 meeting, Brignon informed those in attendance that the Commissioners decided to "think about this a little longer" and postponed the vote on the letter agreement until the next meeting.

Before the next Board of Commissioners meeting on December 19, former mayor Laura Miller appointed Marcella Atkinson as the new tenant representative Commissioner. Atkinson attended the December 19 meeting with Washington and Velazquez; Brignon was absent from the meeting. At the December 19 meeting, the Commissioners announced that although they had previously voted on October 10 not to renew Lott's contract, their goal was to begin the process of negotiating a contract with Lott for the CEO position.

Sometime after the December 19 meeting, Brignon resigned as Chairman, and Miller appointed Betty Culbreath to serve as a Commissioner; Culbreath was elected as Board Chairwoman at the January 18, 2007 Board meeting. The Commissioners also resolved at the January 18 meeting that Lott would retain the position of DHA President and CEO, and they authorized Culbreath, as Chairwoman, to negotiate a new employment contract with Lott. The negotiations were to include an eighteen-month extension of Lott's contract term and the creation of criteria by which to evaluate Lott's performance.

## Procedural Background

Killingsworth claims that the Commissioners' resolution to retain Lott as DHA President and CEO constituted a repudiation of his letter agreement and that the DHA has refused to allow him to assume the duties under the agreement. He also believes that the Commissioners' decision to disclaim his agreement was influenced by political pressure instigated by several prominent African-American community leaders. That is, Killingsworth contends that Lott was retained as CEO because she is African-American and that he was not put in the position because he is white. Based on these contentions, Killingsworth alleged claims for breach of contract, violations of his procedural and substantive due process rights under section 1983, *see* 42 U.S.C.A. § 1983, and race discrimination under section 1981, *see* 42 U.S.C.A. § 1981.

The DHA responded to Killingsworth's breach-of-contract claim by filing a plea to the jurisdiction.[4] The DHA argued that its immunity from suit was not waived because there was no evidence of a proper contract with Killingsworth. The DHA also filed a counterclaim, seeking a ruling from the court that if the approval of the agreement occurred as alleged (in a closed, executive session of the Board), then such action was void because the approval did not occur in a properly noticed DHA meeting.[5] In addition, the DHA filed a motion for protective order in which it sought to preclude Killingsworth from inquiring, through written discovery requests and depositions, about matters that took place during the Board of Commissioners' executive sessions. The DHA argued in its motion for protective order that it should not be required to disclose the substance of such discussions because the discussions are (1) irrelevant to Killingsworth's claims, (2) privileged, and (3) protected from disclosure "as proceedings conducted in a lawfully closed meeting of a governmental entity." The trial court granted the

---

[4] The DHA did not challenge the trial court's jurisdiction over Killingsworth's civil-rights claims.

[5] *See* TEX. GOV'T CODE ANN. §§ 551.001–.0146 (West 2012 & Supp. 2014) (Texas Open Meetings Act).

–5–

DHA's motion for protective order and signed an order, sustaining the DHA's objections to certain discovery requests and ordering Killingsworth not to ask deposition questions related to the substance of any discussions or deliberations held in executive session.

The DHA then moved for summary judgment on its counterclaim, arguing, among other things, that the summary-judgment evidence establishes that the approval of the Board as required by the terms of the letter agreement never occurred. The trial court denied both the DHA's motion for summary judgment and plea to the jurisdiction. We affirmed the denial of the plea to the jurisdiction and entered judgment on January 5, 2011. *See Killingsworth*, 331 S.W.3d at 808. The Texas Supreme Court denied the DHA's petition for review on May 6, 2011, and the case resumed in the trial court.

Between July and December 2011, Killingsworth took the depositions of Velazquez, Washington, Brignon, Lott, Miller, and Culbreath. Killingsworth gave his deposition on January 8, 2010, but the transcript of his deposition was not available until January 18, 2010, one day before the hearing on the DHA's plea to the jurisdiction. No excerpts from Killingsworth's deposition were provided as part of the pleadings or record related to the jurisdictional plea.[6]

On December 16, 2011, the DHA moved for summary judgment on all of Killingsworth's claims. The DHA argued that Killingsworth has developed no evidence to support one or more elements for each claim and the conclusive evidence establishes the DHA's entitlement to summary judgment on Killingsworth's claims as a matter of law. The DHA supported its motion with Killingsworth's interrogatory answers, excerpts from the depositions of Velazquez, Washington, Brignon, and Lott, minutes from the January 18 Board of Commissioners meeting, and the affidavit of Ardie Harrison, the DHA's Director of Human Resources and

---

[6]The DHA referenced Killingsworth's deposition testimony in its January 15, 2010 reply to Killingsworth's response to the DHA's summary-judgment motion. The DHA also filed a supplement to that reply on January 19, 2010 to which it attached excerpts from the transcript of Killingsworth's deposition. That supplement was not included in the record in the interlocutory appeal.

Administration. Harrison attached multiple documents to her affidavit, including the DHA's by-laws, personnel policy, procedures for implementing personnel, and minutes from the November 20 and December 19 Board meetings.

Killingsworth argued in response that he raised fact issues on each of his claims. As support, he offered his affidavit[7] and letter agreement, excerpts from the depositions of Brignon, Miller, Velazquez, Washington, and Culbreath plus various exhibits from those depositions,[8] excerpts from Killingsworth's deposition, and the affidavit of his attorney, attaching the DHA's by-laws, the December 5 and December 19 Board minutes, and DHA's discovery responses. In his response, Killingsworth also objected to some of the DHA's summary-judgment evidence and requested a continuance to allow him additional time to conduct further discovery. He specifically sought extra time so that he could depose Senator Royce West, Dallas County Commissioner John Wiley Price,[9] and *Dallas Morning News* reporter Kim Horner "regarding their knowledge of conversations with Mayor Miller and commissioners surrounding the change in votes."

The trial court signed an order granting the DHA's motion for summary judgment in its entirety on March 7, 2012. Thereafter, the DHA filed a motion for entry of final judgment, arguing that the remaining live claim—the DHA's counterclaim for declaratory relief relating to the voidability of the alleged contract—was rendered moot by the trial court's grant of summary judgment. After a hearing, the trial court signed a final judgment, dated April 12, 2012, ordering that Killingsworth take nothing on his claims and dismissing the DHA's counterclaim as moot.

---

[7] Killingsworth's affidavit, dated January 12, 2010, is the same affidavit Killingsworth submitted as support for his opposition to the DHA's plea to the jurisdiction.

[8] The exhibits to the depositions include (1) a December 14, 2006 e-mail exchange between Brignon and Lott about Lott's contract negotiations; (2) a December 18, 2006 press release drafted by Brignon that references an official vote by the Board not to renew Lott's contract; (3) a *Dallas Morning News* article titled "Dallas plans to keep housing agency CEO"; (4) a December 12, 2006 article about extending Lott's contract; and (5) the January 18 Board minutes.

[9] Senator West was among the community leaders that spoke at the DHA Board meetings on December 5 and 19. Commissioner Price attended and spoke at the December 19 meeting only.

## Summary Judgment

Killingsworth raises five issues on appeal. We begin with his first three issues, in which he challenges the summary judgment granted on his claims for breach of contract, violations of his procedural and substantive due process rights under section 1983, and race discrimination under section 1981.

The DHA filed a combined no-evidence and traditional summary-judgment motion on each of Killingsworth's claims. We review the trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). In a no-evidence motion for summary judgment, the moving party must assert that no evidence exists as to one or more of the essential elements of the nonmovant's claim on which the nonmovant would have the burden of proof. *See* TEX. R. CIV. P. 166a(i). When we review a no-evidence summary-judgment motion, we ask whether the nonmovant produced more than a scintilla of probative evidence to raise a fact issue on the challenged elements. *Gen. Mills Rests., Inc. v. Tex. Wings, Inc.*, 12 S.W.3d 827, 833 (Tex. App.—Dallas 2000, no pet.). More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (per curiam). In contrast, less than a scintilla of evidence exists if the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact's existence, or "so slight as to make any inference a guess." *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983); *Smith v. Deneve*, 285 S.W.3d 904, 909 (Tex. App.—Dallas 2009, no pet.).

A party moving for traditional summary judgment must establish that no genuine issue of material facts exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Holloway v. Dekkers*, 380 S.W.3d 315, 320 (Tex. App.—Dallas 2012, no pet.). When we review a traditional summary judgment granted in favor of the party without the burden of

proof, we determine whether that party disproved at least one element of the nonmovant's claim or conclusively proved every element of an affirmative defense. *Holloway*, 380 S.W.3d at 319–20. A matter is conclusively established if ordinary minds cannot differ as to the conclusions to be drawn from the evidence. *Id.* at 320.

In reviewing both a no-evidence and traditional summary judgment, we examine the evidence in the light most favorable to the nonmovant and indulge every reasonable inference and resolve any doubts against the nonmovant. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). When, as here, the trial court's order granting summary judgment does not specify the basis for the ruling, we will affirm the summary judgment if any of the theories presented to the trial court are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

## A. Summary Judgment on Killingsworth's Breach-of-Contract Claim

In his first issue, Killingsworth contends the trial court erred in granting summary judgment for the DHA on his breach-of-contract claim. A claim for breach of contract requires proof that (1) a valid contract existed between the parties; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff sustained damages as a result of that breach. *Holloway*, 380 S.W.3d at 324 (citing *Paragon Gen. Contractors, Inc. v. Larco Constr., Inc.*, 227 S.W.3d 876, 882 (Tex. App.—Dallas 2007, no pet.)). Although the DHA challenged each element of Killingsworth's claim in its summary-judgment motion, the primary contention between the parties relates to the first element—that a valid contract existed between Killingsworth and the DHA. The question of whether an alleged agreement constitutes an enforceable contract is generally a question of law that we review de novo. *See Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 141 (Tex. App.—Dallas 2012, no pet.). Similarly, our

interpretation of an unambiguous contract presents a question of law that is reviewed de novo. *Id.*

There is no dispute that under the terms of the November 21 letter agreement, two conditions must be satisfied for it to be a binding agreement. Specifically, the agreement stated that its terms are "nonbinding unless signed by the Chairman of the Board of Commissioners of the [DHA] and approved by the Board of Commissioners." The DHA concedes that Brignon signed the letter agreement but argues that the conclusive evidence shows that the agreement was never approved by the Board, so by its terms, no valid contract was formed. Killingsworth, on the other hand, asserts that both conditions were met. He contends that he offered competent summary-judgment evidence that the letter agreement was "properly executed, signed by the Chairman, and approved by the Board of Commissioners." He also claims the summary-judgment evidence "clearly establishes fact issues" on the question of whether the letter agreement was approved such that he had an enforceable contract.

As support for his contentions, Killingsworth relies on his affidavit, in which he testified that Brignon told him on November 20 and again on November 21 that "the Board had already voted to approve the Agreement 3-0 in executive session," and the December 19 Board minutes, which Killingsworth claims show a public admission by Washington that a vote took place.[10] He also relies on a December 14, 2006 e-mail exchange between Brignon and Lott regarding negotiations for Lott's new contract. In one portion of the exchange, Brignon wrote:

> Since your contract was officially not renewed under its existing terms and conditions (but open to discussion) by the Board on October 10th and you decided to exit the Agency, the Board officially authorized the execution of a contract for your replacement on November 20th, and that contract is still outstanding.

---

[10] In response to a question from Senator West about whether there had been negotiations with someone other than Lott and with full concurrence of the Board, Washington said "that it was voted on."

Lott requested a copy of that document because she thought "the terms and conditions [the Board was] willing to offer someone else would be a good place to start [their] negotiations." Killingsworth claims that this "written admission by Brignon" shows the contract was authorized by the Board.

The DHA argued in its summary-judgment motion that the plain meaning of the letter agreement requires subsequent approval by the Board for its terms to be binding. Killingsworth's arguments that the above evidence shows the Board approved the agreement or raises a fact issue on the question of the Board's approval, however, depend on an interpretation that the letter agreement does not require subsequent approval by the Board for it to be a binding agreement. In other words, Killingsworth argues the terms of the letter agreement were approved by the Board during the November 20 executive session, before the agreement was signed by Brignon and presented to him. And he maintains his affidavit, coupled with the December 19 minutes and Brignon's e-mail "admission," are evidence of that alleged November 20 approval. He contends that because "the conditional language of the agreement was prepared before the signature, vote and delivery, a jury can easily conclude the Board approved the Agreement and Brignon delivered it."

But if the conditions stated in the letter agreement were satisfied before the agreement was presented to Killingsworth, there were would no need to include such language in the agreement. When we construe a contract, our job is to determine the true intentions of the parties as expressed in the writing itself. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). We favor a construction that "provides meaning to every provision and does not read any term out of the contract." *Mesa Operating Co. v. Cal. Union Ins. Co.*, 986 S.W.2d 749, 753 (Tex. App.—Dallas 1999, pet. denied). The last sentence of the letter agreement says that its terms are nonbinding unless it is signed by the DHA Board

–11–

Chairman and approved by the DHA Board. We read this sentence as a signal that something else has to happen after the agreement is presented to Killingsworth before the parties are bound by this agreement, namely Brignon has to sign the agreement and the Board has to approve it. And because we presume the parties intended these conditions to have some effect, we cannot interpret the agreement in the manner suggested by Killingsworth—as not requiring Board approval after it was presented to him—without rendering this sentence meaningless. *See Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). We therefore agree with the DHA that the letter agreement requires subsequent approval by the Board for its terms to be binding.

Based on that construction, we also agree with the DHA that the summary-judgment evidence conclusively demonstrates that the Board did not vote to approve the letter agreement after it was presented to Killingsworth. The summary-judgment record contains the deposition excerpts of the three Commissioners who would have been responsible for approving the letter agreement. Brignon testified that the Board authorized him to sign the proposed agreement but that it was subject to a vote by the Commissioners in a public session. Brignon said that when he showed Killingsworth the proposed agreement on November 21, he told Killingsworth the agreement was "subject to approval" by the Board. Brignon also said that because the agreement "took board approval," he advised Killingsworth against giving notice to the City of Dallas. Brignon explained that he intended to have a follow-up Board meeting in December during which the Board would officially vote on the agreement. And although the agreement was on the agenda at the December 5 meeting, Brignon said the Board was "unable to vote" because the public asked the Board to reconsider. He specifically testified that "[a]t the meeting where we planned to take the vote in public session there was enough community support for Ms. Lott that we decided to defer to the following meeting." Brignon added that the mayor also asked the

–12–

Board to reconsider the decision. Brignon testified that the proposed agreement was never approved by the Board at any time before he resigned as a Commissioner in late December. He also clarified that when he wrote that the "contract is still outstanding" in his e-mail exchange with Lott, he was referring to the fact that the contract had not been approved by the Board.

Both Velazquez and Washington confirmed that going into the December 5 meeting, the Board was to consider approval of the proposed letter agreement for Killingsworth to serve as DHA President and CEO. Velazquez testified that it was "well understood by all commissioners that, although that letter had been presented, describing the terms, that it would not be fully adopted until it was presented for a vote" at a DHA general Board meeting. Velazquez said that at no time did the Board vote to approve a contract for Killingsworth to serve in the position. Washington likewise testified that the Board did not approve the letter agreement. Washington said that before December 5, he intended to vote to approve the letter agreement. And he testified that despite what appeared in the December 19 minutes about a "vote," there was no public vote on the letter agreement. The December 19 minutes indicate that Velazquez said in a response to a question by Senator West that Brignon "was given permission from the Board to go out and seek candidates" but that "any contract, any discussion is not finalized until it comes back to the Board for final approval and that has not happened yet."

The testimony from Brignon, Velazquez, and Washington about the Board not voting on the letter agreement and the Board meeting minutes indicating that the final approval of a contract had not yet happened are supported by excerpts from Killingsworth's deposition, which was included in the summary-judgment record. Killingsworth testified that although "in [his]

–13–

mind" he had "a valid contract" because Brignon signed it and told Killingsworth "that it was a 3-to-0 vote," he knew that the contract "had to be either ratified up or down and it never was."[11]

Killingsworth also relies on our opinion issued in the interlocutory appeal and contends that the law-of-the-case doctrine[12] prohibits summary judgment on his breach-of-contract claim. *See Killingsworth*, 331 S.W.3d at 814. He argues that because we addressed "virtually the same factual sufficiency issues" in the interlocutory appeal and concluded that "Killingsworth's evidence [was] sufficient to create a fact issue on the existence of an enforceable contract" for jurisdictional purposes, the law-of-the-case doctrine requires the same result in this appeal.

We disagree that the decision we rendered in the interlocutory appeal is the law of the case on the issue of whether Killingsworth raised a fact question on the existence of a valid contract. The question we decided in the prior appeal was whether the letter agreement was "properly executed" on behalf of the DHA for purposes of waiving the DHA's immunity from suit under section 271.152 of the Texas Local Government Code. *Id.* at 810 (noting that under local government code section 271.151(2), only written contracts stating the essential terms of the agreement that are "properly executed on behalf of the local government entity" are contracts subject to section 271.152's waiver of immunity). We analyzed the meaning of the phrase "properly executed" as used in the local government code and determined that based on the language of the statute, the focus of the statute is whether the DHA had the authority to enter into the contract. *Id.* at 811–12. We construed the phrase as referring to the requirements or

---

[11] Killingsworth argued in his response to the DHA's summary-judgment motion that the DHA Board minutes were unreliable and "at worst have been deliberately tampered with" because the minutes were not reviewed and approved by the Board in a regular fashion. He claimed Brignon acknowledged this in a statement he made in a December 18, 2006 press release. The press release mentioned that Brignon released a transcript from the October 2006 Board meeting during which the Board chose not to renew Lott's contract. Brignon conveyed the message that that vote was an official vote. The Commissioners, however, acknowledged that a vote had occurred on October 10 related to Lott's contract renewal. The press release related solely to the issues surrounding the extension of Lott's contract and did not refer or relate to a vote on another candidate's contract for the position. *Cf. TrueStar Petroleum Corp. v. Eagle Oil & Gas Co.*, 323 S.W.3d 316, 321 (Tex. App.—Dallas 2010, no pet.) ("Immaterial fact issues will not defeat summary judgment.").

[12] Under the law-of-the-case doctrine, courts of appeals are ordinarily bound by their prior decisions if there is a subsequent appeal in the case. *In re Assurances Generales Banque Nationale*, 334 S.W.3d 323, 325 (Tex. App.—Dallas 2010, orig. proceeding) (citing *Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003)).

–14–

procedures outlined in the relevant statutes, ordinances, or other documents (such as the DHA's by-laws or resolutions) that give the DHA the authority to enter into a contract. *Id.* at 812. And we concluded that with the evidence Killingsworth presented as part of that proceeding, he raised a jurisdictional fact question as to whether the letter agreement was "properly executed" on the DHA's behalf. *Id.* at 813–14.

The scope of our immunity inquiry did not include a determination of whether the letter agreement was a valid agreement by its terms for purposes of Killingsworth's breach-of-contract claim. Nor did our analysis include an interpretation of the letter agreement itself. But to the extent the opinion could be read as encompassing a pronouncement on whether Killingsworth raised a fact issue on the validity or enforceability of the letter agreement, we observe that the law-of-the-case doctrine is not an absolute bar to reconsideration of an issue. *See Briscoe*, 102 S.W.3d at 716. Rather, we retain discretion to revisit the issue depending on the particular circumstances of the case. *Id.*

We noted in our prior opinion that while the terms of the letter agreement require the Board's approval, the terms do not require "that approval to be in a public meeting." *Killingsworth*, 331 S.W.3d at 813. But at the time we concluded that Killingsworth raised a fact issue related to the proper execution of the letter agreement, we had only Killingsworth's statement that Brignon told him the Commissioners voted in the November 20 executive session to approve the agreement and the Board minutes from that time without any context. Importantly, we did not have the benefit of the additional evidence that the parties procured after the case resumed in the trial court in May 2011 or Killingsworth's testimony from his deposition. *Cf. Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986) (law-of-the-case doctrine "does not necessarily apply when either the issues or the facts presented at successive appeals are not substantially the same" as those involved in the first proceeding). The depositions of the

–15–

Commissioners confirmed that the letter agreement was not approved at any time after it was presented to Killingsworth on November 21. And Killingsworth's testimony that the agreement had to be "ratified up or down" revealed that he knew at the time he signed the letter agreement that there were still steps that needed to be followed to make it binding. That is, he knew about the process for getting his agreement approved, and he admitted that the agreement "never was" ratified by the Board.

We conclude the letter agreement required subsequent approval by the DHA Board after it was presented to Killingsworth and because the summary-judgment evidence conclusively demonstrates that the Board did not approve the letter agreement, Killingsworth cannot prove the existence of a valid contract. His breach-of-contract claim fails as a matter of law, and the trial court properly granted summary judgment for the DHA on this claim. We overrule Killingsworth's first issue.

## B. Summary Judgment on Killingsworth's Section 1983 Due Process Claims

Killingsworth next complains about the summary judgment granted for the DHA on his section 1983 procedural and substantive due process claims. Killingsworth alleged his procedural due process rights were violated when he was "never afforded the Constitutionally required notice and opportunity to be heard" on the abandonment of the letter agreement. And he alleged his substantive due process rights were violated when he was "denied the right to a public vote on his contract." With his substantive due process claim, he asserted that the DHA's announcement of the "termination" of his contract to the media implied it was due to misconduct on his part, which had a negative impact on his reputation in the community.

Section 1983 imposes liability on every person, who under color of any statute, ordinance, regulation, custom, or usage of any state territory, causes deprivation of federally protected rights. 42 U.S.C.A. § 1983. A section 1983 due process claim, however, is "only

–16–

implicated when a person has a constitutionally protected interest in life, liberty, or property." *Conner v. Lavaca Hosp. Dist.*, 267 F.3d 426, 437 (5th Cir. 2001) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)); *see also Baker v. McCollan*, 443 U.S. 137, 140 (1979) (section 1983 claim requires (1) a violation of a right secured by the Constitution or the laws of the United States (2) by a person acting under the color of state law).

Here, both of Killingsworth's due-process allegations hinge on the validity of the letter agreement. He argues that he obtained a constitutionally "protectable property interest in the contract for employment with the DHA" by virtue of the vote affirming the terms of the contract and Brignon's authorized signature upon the contract. As set forth above, however, Killingsworth cannot prove the existence of a valid contract. Because he cannot show that he had a property interest in employment with the DHA, his section 1983 claims also fail as a matter of law. We conclude the trial court properly granted summary judgment for the DHA on this claim and overrule Killingsworth's second issue.

## C. Summary Judgment on Killingsworth's Race-Discrimination Claim

In his third issue, Killingsworth challenges the summary judgment granted on his section 1981 race-discrimination claim. Section 1981 prohibits racial discrimination in the making or enforcement of contracts, which includes the "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C.A. § 1981(a), (b). Killingsworth alleged the DHA discriminated against him on the basis of his race because the DHA "wanted to retain an African American employee, Ann Lott, in order to appease certain local and national African American leaders who wanted an African American to remain as the CEO of the DHA." He argues on appeal that Lott received preferential treatment because of her race when the Commissioners publicly voted to approve her contract but denied him the same vote.

–17–

When, as here, there is no direct evidence of discrimination, we apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *see also Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989) (*McDonnell Douglas* burden-shifting framework applies to section 1981 claims). Under this framework, Killingsworth is entitled to a presumption of discrimination if he meets the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802.[13] The prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). Once Killingsworth establishes a prima facie case, the burden shifts to the DHA "to rebut the presumption of discrimination by producing evidence" of a legitimate, nondiscriminatory reason for rejecting Killingsworth or retaining Lott. *Burdine*, 450 U.S. at 254. If the DHA carries its burden, the prima facie case dissolves, and the burden shifts back to Killingsworth to demonstrate that the DHA's proffered reason was not the true reason. *Id.* at 256. He may do this by persuading the court that the DHA's proffered reason was a pretext for discrimination. *Id.* In the summary-judgment context, this means that Killingsworth must present more than a scintilla of evidence that the DHA's reason for deciding to retain Lott and not put him in the position was made with a discriminatory motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 516–17 (1993).

For purposes of this opinion, we will assume, without deciding, that the summary-judgment record contains evidence of a prima face case of race discrimination. So, we turn to the DHA's rebuttal to the presumption of discrimination arising from the prima facie case. The

___

[13] The precise elements for the prima facie case will vary depending on the circumstances and allegations of the plaintiff. *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 477 (Tex. 2001). In fact, the parties here have presented varying elements for Killingsworth's prima facie case.

DHA's stated reason for retaining Lott was that she was a "long-time employee of and advocate for [the] DHA and its mission." To support this reason, the DHA presented excerpts from Lott's deposition, which it attached as summary-judgment evidence, in which she testified to her long-time service with the DHA and her accomplishments during her tenure. In particular, Lott highlighted the role she played in settling a 20-year old class action lawsuit and her development of memoranda of agreement to improve the living environment and social skills for the families that participated in the Section 8 housing program. Lott's accomplishments and leadership also were emphasized in the December 5 Board meeting. The minutes from that meeting showed that multiple members of the community offered comments on Lott's service, successes, and relationships among certain business partners in the community. After hearing the comments, the Board postponed making a decision on the position of DHA President and CEO.

The DHA's summary-judgment evidence also included the depositions of the three Board Commissioners who were involved in the decision-making. Each Commissioner testified that race was not a factor in the decision to retain Lott as the DHA President and CEO instead of hiring Killingsworth for the position. Velazquez testified that his consideration of the proposed letter agreement with Killingsworth was "[a]bsolutely not" based on Killingsworth's race. He also said that Lott's race was not important to him. Similarly, Washington testified that Lott's race did not influence his support of her. Brignon testified that he did not believe the race of the DHA President was an important part of the job. Brignon also confirmed that no Commissioner ever expressed that opinion to him or say or imply that race played a role in whether to enter into a contract with Lott or Killingsworth.

Killingsworth argues that the DHA's articulated reason for retaining Lott is "highly suspect, given that the reason was equally true on October 10, 2006 when the Board voted not to renew her contract." He also says that the reason is suspect because the Commissioners knew

that there were issues with Lott's performance in relation to the DHA's accounting systems, books, and policies not meeting a satisfactory rating on HUD agency audits. He urges that the Commissioners made the decision to retain Lott because of threats by African-American community leaders to use political pressure against them.

But despite his contention that the Commissioners were influenced by racial political pressure in deciding to retain Lott, Killingsworth does not provide any summary-judgment evidence to raise a fact question that the decision to retain Lott and not put him in the position was made with a discriminatory motive. To the contrary, Killingsworth testified that he did not think that any of the Commissioners improperly used race as their basis for retaining Lott and each Commissioner testified that race was not a factor in their decision to retain Lott. Brignon specifically testified that he was never told that it was politically important that an African-American retain the position as President. And Brignon did not sense that the community participation at the December 5 Board meeting was a political campaign by the African-American community to keep an African-American in that position, stating "I didn't see that – that kind of thing going on." Washington said that his discussions with the mayor about what should happen with the position did not include the political question of whether the job should be filled by an African-American. Washington also testified that while he was contacted by Senator West and other prominent African-American politicians, the conversations centered on support for Lott and not the importance of keeping the position "in the hands of an African American." Velazquez recalled that Senator West's main complaint was that the Board was making a decision about the CEO position without having full Board representation. Velazquez said Senator West called him after the December 5 meeting to gain an understanding of the performance issues with Lott. He testified he did not recall Senator West threatening to "make waves" for Velazquez at his job if he did not change his vote.

Killingsworth's evidence of discriminatory intent rests on his subjective belief that he was discriminated against because he is white and Lott's contract was renewed because she is African-American. But his subjective belief of discrimination, no matter how genuine, is not enough to controvert the DHA's evidence of a nondiscriminatory reason or raise a fact issue on the DHA's discriminatory motive. *See Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 434 (5th Cir. 1995). We conclude that because Killingsworth did not raise a fact issue on his section 1981 claim, the trial court properly granted summary judgment for the DHA on this claim. We overrule Killingsworth's third issue.

**Killingsworth's Additional Issues**

**A. Summary Judgment Granted Before the Completion of Discovery**

Killingsworth's fourth issue relates to his request for a continuance to conduct three additional depositions. He made this request in his response to the DHA's motion for summary judgment filed on January 12, 2012. Relying on the 1997 comments to rule of civil procedure 166a(i), he argued that "normally a hearing on a no-evidence motion should not be held until the discovery period in a case has expired." The trial court signed the order granting the DHA's motion on March 7, 2012.[14] Killingsworth argues on appeal that because the interlocutory appeal superseded the prior scheduling order and the discovery deadline had not been reset (and in the face of his request for leave to conduct additional depositions), the trial court erred in entering a no-evidence summary judgment "without allowing [him] to complete discovery."

We first note that rule 166a(i) does not require that discovery be completed before a party may move for no-evidence summary judgment. *See* TEX. R. CIV. P. 166a(i). Rather, the trial court may grant a no-evidence motion for summary judgment "[a]fter an adequate time for

---

[14] When a trial court signs an order granting summary judgment, the court implicitly denies the opposing party's request for a continuance. *See Williams v. Bank One, Tex., N.A.*, 15 S.W.3d 110, 114 (Tex. App.—Waco, no pet.).

discovery." *Id.*; *see also Dishner v. Huitt-Zollars, Inc.*, 162 S.W.3d 370, 376 (Tex. App.—Dallas 2005, no pet.) (no "bright-line requirement" that discovery period be completed before no-evidence motion filed). The question of whether a nonmovant has had adequate time for discovery under rule 166a(i) is a case-specific determination that we make by considering various factors, such as the nature of the cause of action, the nature of the evidence necessary to controvert the no-evidence motion, the amount of discovery that has already taken place, and the length of time the case has been active in the trial court. *Rest. Teams Int'l, Inc. v. MG Secs. Corp.*, 95 S.W.3d 336, 339–40 (Tex. App.—Dallas 2002, no pet.) (listing and analyzing factors).

But we need not analyze those factors in this case. When a party contends that he has not had an adequate opportunity for discovery before the consideration of a no-evidence summary judgment, he "must file either an affidavit explaining the need for further discovery or a verified motion for continuance." *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 647 (Tex. 1996); *Dishner*, 162 S.W.3d at 376–77; *see also* TEX. R. CIV. P. 166a(g), 251, 252. Killingsworth did neither.[15] Killingsworth also has made no effort on appeal to discuss any of the relevant factors or otherwise argue why the time between when the case was reinstated and the DHA filed its summary-judgment motion was not adequate. *See Rest. Teams Int'l*, 95 S.W.3d at 339–40; *see also Robertson v. Sw. Bell Yellow Pages, Inc.*, 190 S.W.3d 899, 903 (Tex. App.—Dallas 2006, no pet.) (concluding that complaint about whether adequate time for discovery had elapsed not adequately briefed because appellant did not discuss any of the relevant factors). Accordingly, Killingsworth cannot show that the trial court abused its discretion in deciding the motion when it did. *See Patten v. Johnson*, 429 S.W.3d 767, 776 (Tex. App.—Dallas 2014, pet. denied) (trial

---

[15] We reject Killingsworth's contention that excerpts from his January 2010 deposition serve as "competent sworn testimony" to support his January 2012 request for additional time to conduct further discovery. Although Killingsworth attached this deposition excerpt to his response to the DHA's motion for summary judgment, he does not cite to any testimony or rely on this excerpt in his request for a continuance to conduct additional discovery. In addition, none of this testimony adequately explains the need for further discovery or addresses why he could not obtain the needed discovery before the submission of the summary-judgment motion. *See Tenneco Inc.*, 925 S.W.2d at 647. Rather, all this excerpt shows is that Killingsworth wanted to take the depositions of Senator West and Commissioner Price because he believed their testimony would support his contention that race was involved in the decision to retain Lott.

court's decision on whether to grant a continuance to allow for additional discovery reviewed for an abuse of discretion); *Rest. Teams Int'l*, 95 S.W.3d at 339 (review of trial court's determination that adequate time for discovery has passed governed by abuse-of-discretion standard). We overrule Killingsworth's fourth issue.

## B. Limiting Discovery of Statements at Closed Meetings

In his final issue, Killingsworth asserts the trial court erred when it granted the DHA's motion for protective order, which he claims "foreclosed all inquiry into discussions during executive sessions from the former Commissioners" and "exclud[ed] all testimony concerning what was said or done during the meetings." He contends the court's decision to prohibit discovery of events and statements made by the Commissioners during their closed, executive sessions likely resulted in an erroneous decision by the trial court. The DHA responds that Killingsworth's complaint about the propriety of the protective order is based on a misinterpretation of the limitations contained in the protective order. We agree with the DHA.

In the November 2, 2009 order granting the DHA's motion for protective order, the trial court directed Killingsworth to "not propound deposition questions on former or present Board of Commissioners or employees of DHA relating to the substance of any discussions or deliberations held in executive session." The order did not prohibit or ban Killingsworth from discovering what matters were discussed in the closed sessions or what happened in those sessions. And the record shows that Killingsworth did solicit deposition testimony related to what happened during the executive sessions. "A trial judge may exercise discretion in the granting of a protective order and in controlling the nature and form of discovery." *Brewer & Pritchard, P.C. v. Johnson*, 167 S.W.3d 460, 466 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). Based on the record before us, we cannot conclude the trial court abused its discretion in limiting the discovery related to closed meetings.

Even if it was error to preclude discovery into the substance of what happened during executive sessions, we conclude that given our disposition of his first issue, Killingsworth was not harmed by this error. Killingsworth's contention throughout the litigation has been that the letter agreement was approved by the Commissioners during their November 20 executive session as told to him by Brignon. So, he sought discovery of that because "records and testimony concerning a vote, even if taken in executive session, are relevant to the enforcement of the letter agreement." But we have concluded that the letter agreement required approval by the Board of Commissioners after it was presented to Killingsworth and the summary-judgment evidence conclusively demonstrates that the Board did not vote to approve the letter agreement after that time. The December 5 Board minutes do not indicate that the Commissioners went into executive session during that meeting. And while the December 19 minutes show that the Commissioners recessed for a closed meeting on that day, the recess was after they announced their intent to negotiate a new contract with Lott.

Finally, we reject Killingsworth's contention that the requested information was relevant because the executive sessions "might also cast light on whether racial politics influenced the Commissioners." Killingsworth testified that he did not think any of the Commissioners improperly used race as their basis for retaining Lott instead of hiring him. Further, his race-discrimination allegations point to events that would have taken place outside a closed meeting. We overrule Killingsworth's fifth issue.

**Conclusion**

We conclude the trial court properly granted summary judgment for the DHA on Killingsworth's claims for breach of contract, violations of his procedural and substantive due process rights under section 1983, and race discrimination under section 1981. We also conclude that Killingsworth did not show the trial court abused its discretion in deciding the DHA's no-

–24–

evidence summary judgment motion before the close of discovery and in granting the DHA's motion for protective order. We therefore affirm the trial court's judgment.

/Ada Brown/
ADA BROWN
JUSTICE

120524F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JERRY KILLINGSWORTH, Appellant

No. 05-12-00524-CV　　V.

THE HOUSING AUTHORITY OF THE
CITY OF DALLAS, Appellee

On Appeal from the 134th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. 09-08714.
Opinion delivered by Justice Brown.
Justices Bridges and O'Neill participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

It is **ORDERED** that appellee The Housing Authority of the City of Dallas recover its
costs of this appeal from appellant Jerry Killingsworth.

Judgment entered this 14th day of October, 2014.